[Crim. No. 10014. First Dist., Div. Two. Dec. 21, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
GORDON H. ANDERSON, Defendant and Appellant.

## Counsel

Ludlow & Thompson and Robert H. Ludlow, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Robert R. Granucci and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**TAYLOR, P. J.**—Defendant, G. H. Anderson, M.D., appeals[1] from a judgment and order granting probation[2] entered after a jury found him guilty, as charged, of six counts of improperly issuing prescriptions to narcotic addicts, in violation of Health and Safety Code section 11162.5.

Defendant raises a question of first impression as to whether the last sentence of Health and Safety Code section 11162.5 is unconstitutionally vague, as well as additional contentions concerning Health and Safety Code section 11391, the instructions to the jury, and the sufficiency of the evidence.

Viewing the record most strongly in favor of the judgment, as we must, the facts are as follows: Defendant, a practicing physician, issued orders purporting to be prescriptions for the narcotic Dolophine, a trade name for Methadone, to six ambulatory narcotic addicts: Jack Arbuckle and his wife Marilyn, Fred Veitenheimer and his wife Dolores, Fred Acosta, and Kenneth Walker. The Arbuckles, the Veitenheimers and Acosta lived

---

[1] A premature notice of appeal was filed prior to the hearings on defendant's post-trial motions.

[2] Since the court did not pronounce judgment but suspended proceedings, there is no final judgment and that purported appeal must be dismissed (*People v. Cordova,* 253 Cal.App.2d 434, 435 [61 Cal.Rptr. 327]; *People v. Jones,* 36 Cal.2d 373, 375 [224 P.2d 353]). The order granting probation, however, is appealable (Pen. Code, § 1237, *subd. 1*).

in San Jose; Walker in Palo Alto. In February 1970, each came for the first time as a patient to defendant's office in Santa Cruz and indicated a heroin addiction, including the duration and cost of the habit, a fact that was duly entered on defendant's patient record cards, as noted below.[3] After stating a desire to "clean up," each was examined by defendant (the examination included a urine sample) and then given a written prescription for 10 milligrams of Dolophine to be taken four times a day for four days. The prescriptions stated: "Take as directed and immediately cut down and immediately report to a Drug Abuse Center as arranged." Each of the six also signed a statement typed on defendant's stationery agreeing to go to the "nearest Drug Abuse Center (as related to where I live) within 48 hours."

None of the six was suffering from preliminary or acute withdrawal symptoms[4] or illness at the time of the afternoon visit to defendant. The record indicated that all but Acosta had pinpointed pupils. Jack Arbuckle had had a "fix" that morning; his wife, the previous morning. Walker and Acosta had also used heroin shortly before seeing defendant.

The Arbuckles and Walker also received additional prescriptions for Tuinal. The Arbuckles and Walker testified that at the time of the examination, there were a number of other people in the room. Defendant gave them a lecture concerning addiction and indicated that all were to report to a drug abuse center, and that they could come to him only once. Walker and Mrs. Arbuckle indicated that one of the patients did not have $10 to pay for the prescription but was loaned the necessary amount by the nurse.

Sharon Piers testified that she and her fiance saw defendant on January 31, 1970, after taking LSD. She signed papers indicating that it was an emergency visit and obtained prescriptions for Methadone and Nembutal. Defendant told her and her fiance that he was taking a chance in helping them but if they signed the paper indicating their intention to go to a drug abuse center, it would be all right.

State Narcotics Agent Freitag, on February 10, 1970, went to defendant's office using the name Pollett. The receptionist asked him if he had a narcotics problem and he gave a positive answer indicating he used

---

[3]Defendant's records (or testimony at the trial) indicated that the six had habits ranging from $15 a day (a quarter of a spoon) for Acosta and $25 a day for Walker, to $40-$50 a day for each of the Arbuckles, and $45 a day for Mrs. Veitenheimer. Mr. Arbuckle had been addicted to heroin for 22 of his 43 years; his wife, for 2 of 37 years; Mr. Veitenheimer, on and off for 15 of his 33 years; his wife, 3 of her 29 years; Acosta, 6 of his 30 years; and Mr. Walker, 2½ of his 21 years.

[4]The typical withdrawal symptoms are: 1) preliminary—running nose and light sweating; 2) acute—sweating, muscular and intestinal cramps, vomiting and dilated pupils.

Didalid. He was not examined or a urine sample taken. When he asked defendant for more Didalid, defendant said he could not have it but he could have some codeine. He told defendant he had a cold but did not mention he had a headache as shown on defendant's medical record. He denied stating he was an addict but indicated his wife was. He never told anyone he had sniffed morphine.

Inspector Verbrugge stopped the Veitenheimers and Acosta outside defendant's office on the afternoon of February 13, 1970. He took their prescriptions and told them to report to the Santa Clara County Hospital for treatment, as all were residents of that county. Verbrugge indicated that it was illegal for a doctor to prescribe Dolophine for an ambulatory addict unless there was an emergency, such as a broken leg.

Mr. McCrae, a Santa Cruz pharmacist who filled the Dolophine orders issued to the Arbuckles and Walker, had never seen a prescription with the notation "Report to the Drug Abuse Center as arranged." E. J. Mantler, a state narcotics agent who specialized in physicians' prescriptions, concurred.

Mantler arrested defendant on February 13, 1970, and after giving the appropriate *Miranda* warnings, questioned defendant about 16 of 64 identical Dolophine prescriptions and as to the specific arrangements that had been made with a drug abuse center for the six patients here involved. Defendant replied that he had called the drug abuse center in San Jose several times but did not know to whom he talked; the San Jose center agreed to take the patients. When asked why the patients were coming to his office in Santa Cruz from as far away as Sacramento and San Jose, defendant said he did not know and had himself wondered about it. Defendant was worried as to why so many people with narcotics problems were coming to see him and was somewhat worried about what he was doing. He saw them and prescribed for them on an emergency basis as he felt they were sick.

In another conversation taped after his arrest, defendant also stated that he first began prescribing Dolophine in late October or November 1969 to maintain or hold addicts over until they reported to a drug abuse center. Again, he could not recall the names of the persons he had arrangements with at the San Jose center and had conducted no follow-ups as to whether the patients he so instructed had, in fact, reported. He was prescribing on an emergency basis and charging $8.00 for an ordinary office visit and $2.00 for a urine sample.

The prosecution's narcotics expert, Dr. Victor H. Vogel, in replying to

a hypothetical question based on the circumstances of the six orders here involved, testified that a prescription of a narcotic was not proper under the circumstances and was not "in the course of professional treatment." Dolophine keeps an addict comfortable by maintaining use. Dr. Vogel was in severe disagreement with the state's experimental Methadone projects as they were only substituting addiction for one drug with another. However, Methadone, with its more gradual effect and less acute withdrawal symptoms, constituted appropriate treatment for addiction provided there was first substitution of Methadone for heroin and then a withdrawal from Methadone.

In Dr. Vogel's opinion, it was proper for a doctor to give an addict a prescription for one or two doses of Methadone if the addict was on his way to the hospital. The prescription, however, should just last long enough for the addict to get to the hospital, instead of the four days involved in each of the six orders here involved. The normal therapeutic dosage of Dolophine for pain relief is 5-10 milligrams, but addicts have a much higher tolerance, depending on body weight, and can tolerate many times the normal lethal dosage of 50-80 milligrams.

In Dr. Vogel's experience, only a rare addict can "clean up" on his own with the aid of a Methadone prescription outside an institution. Despite the fact that institutional programs have not been very successful, Dr. Vogel believed it was the only proper procedure. Narcotic addiction is a peculiar disease and Methadone treatment is not likely to be successful outside an institution. Accordingly, enforced detention for the treatment of narcotic addicts is appropriate. Narcotic addicts are sick because of their addiction to a particular chemical and because they are under the influence of an unnatural chemical, as distinct from insulin, which is a natural product.

When questioned about a statement in a textbook concerning the propriety of a doctor prescribing narcotics for an addict, Dr. Vogel replied that he believed the statement assumed that the patient was suffering from withdrawal symptoms. In reply to a question as to the proper medical procedure for an addict who was not exhibiting extreme withdrawal symptoms, Dr. Vogel indicated that it was very difficult to reply, as an addict was in a delicate balance between too much and too little; only if an addict is undergoing withdrawal symptoms are his normal functions, such as driving, impaired. In Dr. Vogel's opinion, all people on Methadone in the state programs were not functioning normally as they were in a state of dependence on Methadone. In his opinion, a prescription for Methadone

is legal only as a part of overall withdrawal at the beginning of institutional treatment.

Dr. Frederick Meyers, the defense narcotics expert, in response to a hypothetical question based on the circumstances surrounding the six orders here involved, testified that defendant's action constituted sound medical treatment on an interim basis. He indicated that while an older minority of physicians felt that the administration of Methadone was wrong, the drug effectively blocked the effect of heroin and does not have its own narcotic effect after an individual has become stabilized. If a heroin addict who was accustomed to the sexual type of thrill received from the direct injection of heroin was given an oral drug, such as Dolophine, the customary pattern of use was destroyed. The addict would also not be comfortable with Dolophine after the first day if he properly followed the directions of taking four 10 milligram pills a day. The size of his habit, however, would affect the degree of his discomfort.

Dr. Meyers distinguished between definitive and interim types of treatments for narcotic addicts. He believed that each of the six situations here involved was an emergency situation, and that defendant had rendered a proper first aid type of treatment, as available community facilities for the treatment of addicts were somewhat limited. The additional prescriptions of Tuinal for the Arbuckles and Walker also constituted proper interim treatment for addicts going off drugs who usually have trouble sleeping. The maximum daily legal dosage of Methadone was 180 milligrams but most of the state programs for addicts used between 80 and 100 milligrams. In his opinion, the definition of "customary use" would depend on the particular addict and the size of his habit.

The defense also called five other addicts who had received Dolophine prescriptions from defendant after appearing at his office in varying stages of preliminary or acute withdrawal. One of these, like most of the prosecution witnesses, had a fix early the morning before she saw defendant, but had withdrawal symptoms when she was in his office. Another, at the time she saw defendant, was addicted to heroin with a $50 to $75 a day habit and also had had a fix just before visiting defendant's office on February 1, 1970. After taking his prescription for the pills, she became "clean" and was in a Methadone program at the time of trial.

Defendant's receptionist, Mrs. E. Wooley, testified that the first addict treated was in July 1969. The second, Charlene Prall, came on August 15, was sent to the county hospital, and then returned. Between July 1969 and February 13, 1970, defendant saw 2,819 patients. In this period, there were 171 heroin addicts who obtained Dolophine prescriptions. The typed

slip to be signed by the patients agreeing to report to the nearest drug abuse center within 48 hours, was first used in October 1969. She was in charge of keeping the records for all of the patients and indicated the fact that they were narcotic addicts on the records. She remembered a patient named Pollett whom she suspected of being a state narcotic agent as he indicated that he sniffed morphine.

Defendant's office nurse, Mrs. R. Duffey, indicated that defendant usually saw 25 to 30 patients a day. The first narcotic addict she remembered as a patient was Charlene Prall in September who came in with severe withdrawal symptoms and was sent to the Santa Clara County Hospital. She was then sent back as the county hospital could not do anything for her. Miss Prall received a prescription from defendant. Most of the addicts who came were very ill and exhibited the usual withdrawal symptoms. To take care of the many people in his office, defendant often gave them a joint lecture about the dangers of addiction, and reporting to a drug abuse center. She admitted loaning $10 to a young addict one Saturday in February and remembered a morphine addict whom she suspected of being a state agent.

Defendant first contends that the last sentence of Health and Safety Code section 11162.5 is unconstitutionally vague. The statute provides: "A prescription, in order to be effective in legalizing the possession of unstamped narcotic drugs and eliminating the necessity for use of order forms, must be issued for legitimate medical purposes. The responsibility for the proper prescribing and dispensing of narcotic drugs is upon the practitioner, but a corresponding liability rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued *to an addict or habitual user of narcotics, not in the course of professional treatment but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use,* is not a prescription within the meaning and intent of this division; and the person filling such an order, as well as the person issuing it, may be charged with violation of the law." (Italics added.)

Although the constitutionality of the section as a whole in prohibiting false prescriptions was upheld in *People* v. *Bowman,* 156 Cal.App.2d 784, 799-800 [320 P.2d 70], the question of the constitutionality of the particular language here challenged by defendant has never been presented to an appellate court.

Defendant, relying on *McMurtry* v. *State Board of Medical Examiners,* 180 Cal.App.2d 760 [4 Cal.Rptr. 910], urges that the term "habitual

user" is vague and indefinite.[5] In *McMurtry*, the court so found, at pages 772-773, as only the term "habitual user" appears in Health and Safety Code section 11425 and could mean either a person who was a narcotics addict or a person who used narcotics frequently but was not addicted. But *McMurtry* is of no help to defendant here. As section 11162.5 uses the language "addict or habitual user," there are not two possible meanings for the same term as considered in *McMurtry*. Further, all six of the patients here involved were narcotic addicts according to defendant's own records, and there was no confusion as to whether they were addicts or habitual users.

Defendant further argues that the phrase "not in the course of professional treatment" is too vague, uncertain and indefinite to give notice of what constitutes the act sought to be prohibited. This contention is likewise without merit under the facts of the instant case. The uncontroverted evidence indicates that defendant wrote the six orders in the course of what he believed was a proper "emergency." In his opinion, he was not involved in "treatment" as that implies a series of visits. While his own expert, Dr. Meyers, agreed with him that there was an emergency, the testimony of the prosecution expert, Dr. Vogel, was to the contrary, and was believed by the jury. We note that an identical argument was rejected as to the similar phrase "Except in the regular practice of his profession" in Health and Safety Code section 11163 (*People* v. *Nunn*, 46 Cal.2d 460 [296 P.2d 813]).

Defendant next contends that the term "comfortable" is not sufficiently clear, as anything a physician does is for the comfort of the patient. He also urges that the phrase "customary use" is vague unless used to refer only to a prescription for the same narcotic to which the person is addicted. We cannot agree. The entire clause "for the purpose of providing the user with narcotics sufficient to keep him *comfortable* by maintaining his *customary* use" (italics added) must be read in context with the intent element of the offense that it describes. Significantly, this portion of the statute does not define the proscribed offense in terms of an order purporting to be a prescription for an amount to keep the user comfortable, but only describes the specific intent element of the offense. For the same reason, the statute does not indicate for how long the user is to be kept comfortable, or the degree of comfort.[6] Rather, the specific intent is defined in terms of keeping the user from suffering withdrawal symptoms.

[5]Defendant's argument is erroneously predicated on the assumption that Mrs. Arbuckle was merely a habitual user rather than an addict. This contention, however, is contrary to both the testimony and defendant's records.

[6]This would be impossible as the uncontroverted expert testimony of both the prosecution and defense in the instant case indicates that the precise quantity of

■  Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears (*Collins* v. *Riley,* 24 Cal.2d 912, 915 [152 P.2d 169]). Mere difficulty in ascertaining the meaning of the statute or the fact that it is susceptible of different interpretations will not render it nugatory (*People* v. *Howard,* 70 Cal.2d 618, 624 [75 Cal.Rptr. 761, 451 P.2d 401]). ■  If an accused can reasonably understand by the terms of the statute that his conduct is prohibited, the statute is not vague (*United States* v. *Harriss,* 347 U.S. 612, 617 [98 L.Ed. 989, 996, 74 S.Ct. 808]). In determining the sufficiency of the notice, a statute must of necessity be examined in the light of the conduct with which the defendant is charged (*United States* v. *National Dairy Corp.,* 372 U.S. 29, 33 [9 L.Ed. 2d 561, 565-566, 83 S.Ct. 594]). ■  Furthermore, in the field of "regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed" than in statutes applicable to the general public (*Papachristou* v. *City of Jacksonville,* 405 U.S. 156, 162 [31 L.Ed.2d 110, 115-116, 92 S.Ct. 839], decided Feb. 24, 1972). Applying the above rules to the instant case, we conclude that Health and Safety Code section 11162.5, by its terms limited to physicians and pharmacists, is sufficiently certain and not unconstitutionally vague.

■  Defendant next argues that he was erroneously charged under the general section, Health and Safety Code section 11162.5, rather than the more specific Health and Safety Code section 11391, set forth below.[7] We cannot agree.

Health and Safety Code section 11162.5 is a part of division 10 of the Health and Safety Code entitled "Narcotics." The statute is a part of chapter 3 entitled "Requirements of Prescriptions." Section 11000 defines

---

Methadone required to keep a heroin addict comfortable would depend on the weight and size of the addict and the size and duration of his heroin habit.

[7]At the time here pertinent, section 11391 read as follows: "No person shall treat . an addict for addiction except in one of the following:

"(a) An institution approved by the Board of Medical Examiners, and where the patient is at all times kept under restraint and control.

"(b) A city or county jail.

"(c) A state prison.

"(d) A . . . facility designated by a county and approved by the State Department of Mental Hygiene pursuant to Division 5 (commencing with Section 5000) of the Welfare and Institutions Code.

"(e) A state hospital.

"(f) A county hospital. . . . .

"This section does not apply during emergency treatment, or where the patient's addiction is complicated by the presence of incurable disease, serious accident, or injury, or the infirmities of old age.

"Neither this section nor any other provision of this division shall be construed to prohibit the maintenance of a place in which persons seeking to recover from narcotic addiction reside and endeavor to aid one another and receive aid from others in

the term "Physician." Sections 11001 and 11002 list the narcotic substances for which prescriptions are required. Section 11007 defines a prescription, and section 11161 indicates that a physician is a person authorized to write a prescription. Thus, the last sentence of section 11162.5 relates to the circumstances when a written order is not a prescription within the meaning of the statute and the issuing physician is in violation of the law.

Section 11391 is a part of chapter 4 of division 10, and specifically relates to the professional treatment of persons addicted, a much broader area than the narrow scope of prescriptions regulated by section 11162.5. Thus, section 11391 does not prescribe an offense within section 11162.5 but merely sets forth "several conditions when treatment may be undertaken without violation of the law" (*People* v. *Lawrence,* 198 Cal.App.2d 54 [18 Cal.Rptr. 196]). The offense of violating section 11391, treating an addict at a place other than that specified, can be committed without necessarily also violating section 11162.5. It follows that section 11391 is not a lesser offense necessarily included in section 11162.5.

Defendant erroneously argues that he was charged under 11162.5 rather than 11391 as the latter carries only a misdemeanor penalty. His contention is entirely without merit as a violation of 11162.5 may be either a misdemeanor or a felony (Health & Saf. Code, § 11715.7).

Defendant also argues that the trial court's failure, *sua sponte,* to instruct the jury on section 11391 erroneously deprived him of the possible defense that he was treating an emergency condition. The record indicates that defendant did not request such an instruction and that there was conflicting evidence as to the existence and definition of a medical emergency under the circumstances here present. Defendant and his expert witness indicated that they considered the existence of an addiction as an emergency. The prosecution's expert, however, indicated that no true medical emergency was present since none of the six patients were suffering

recovering from such addiction, nor does this section or such division prohibit such aid, provided that no person is treated for addiction in such place by means of administering, furnishing, or prescribing of narcotics. The preceding sentence is declaratory of preexisting law. Every such place shall register with and be approved by the Board of Medical Examiners. The board may inspect such places at reasonable times and, if it concludes that the conditions necessary for approval no longer exist, it may withdraw approval. Every person admitted to such a place shall register with the police department of the city in which it is located or, if it is outside of the city limits, with the sheriff's office. The place shall maintain its own register of all residents. It shall require all its residents to register with said police department or sheriff's office and, upon termination of the residence of any person in said place, it shall report the name of the person terminating residence to said police department or sheriff's office."

from any acute withdrawal symptoms at the time they were in defendant's office and obtained their prescriptions. It has been held that the prosecution is not required to negate the emergency exception of section 11391 (*People* v. *Lawrence, supra,* pp. 62-63). Under these circumstances, the trial court was not required to give an instruction, *sua sponte,* relating to section 11391.

■ Defendant also contends that his requested instruction defining "in the course of professional treatment," as set forth below,[8] was erroneously refused. The record, however, indicates that the instruction was refused by the trial court as being too limited, and that the court properly instructed the jury on the elements of the offense, the requirement of specific intent to prescribe for the purpose set forth in the statute, and the definition of the term "legitimate medical purpose," as used in the statute. Under these circumstances, defendant's requested instruction was properly refused.

■ Defendant also argues that the trial court erred in modifying his proposed instruction as to the term "customary use," set forth below.[9] The record indicates that the trial court modified defendant's proposed instruction as follows: "Customary does not mean exactly the same use, nor the use of the same narcotic. Customary use is that use which as the result of the prescription of any narcotic would perpetuate or continue a substantially similar condition in the addict or habitual user being prescribed for."

Defendant argues that the instruction did not take into account the evidence and the meaning of the term "in the context of narcotic addiction." We do not think that the trial court's modification of the definition in any way harmed defendant. The term "customary" is a broader term than "the same" and the court's clarification was both proper and helpful and constituted a correct definition.

■ Finally, defendant argues that the judgment must be reversed

---

[8]"Whether or not a prescription is issued in the course of professional treatment is a question of fact for you to decide.

"In deciding this question you may consider any matter that has a tendency in reason to prove the presence or absence of professional treatment, including but not limited to the following:

"1. Whether or not the patient prescribed for was seen by the Doctor.

"2. The extent of any physical examination.

"3. The presence or absence and extent of any case history taken.

"4. Expert testimony relative to normal procedures and practices.

"5. Quantity of drug prescribed.

"6. Nature and effect of the drug prescribed."

[9]" 'Customary Use' means that use which is *normal, usual* or *habitual.*"

as the evidence was insufficient to sustain the judgment that he had provided *sufficient narcotics* to keep the six patients comfortable by maintaining their customary use. He erroneously maintains that no testimony was introduced concerning the quantity used by each of the six persons involved. His own records indicate that each of the six had a heroin habit of a substantial size and for a number of years. Each of the six addicts received an identical prescription for four 10-milligram tablets a day for four days. As indicated in our discussion of the constitutionality of the statute above, the language "sufficient to keep him comfortable by maintaining his customary use" does not describe a part of the substantive offense, but merely describes the specific intent required. Thus, the prosecution was not required to show that defendant had prescribed for each of the six the precise amount of Methadone needed to keep that person comfortable according to the particular size and duration of the heroin habit. It was for the jury to determine whether defendant's intent in providing the 40-milligram prescriptions was to prescribe an amount sufficient to keep each individual comfortable by maintaining his customary use. The prosecution's expert testified that Methadone would keep an addict "comfortable." In addition, each of the six testified that he did not follow the prescription and only take four pills a day. Mrs. Arbuckle, for example, took 8 or 10 pills the first day. From these facts and defendant's failure to make definitive arrangements with the drug abuse center, the jury could infer that defendant had the requisite specific intent to keep the six patients comfortable by maintaining customary use, that is, without withdrawal symptoms.

The order granting probation is affirmed, and the purported appeal from the final judgment dismissed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 14, 1973.