[Crim. No. 34299. Second Dist., Div. Four. Apr. 14, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LEROY WILLIAM DEMERY, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, Violet C. Rabaya and Edward V. Washington, Jr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**JEFFERSON (Bernard), J.**\*—By consolidated information, defendant, a doctor, was charged in 35 counts with the offenses of prescribing a controlled substance not in his regular practice, all in violation of Health and Safety Code section 11154.[1] Nine of the counts were charged as felonies, and the remaining counts were charged as misdemeanors. Defendant entered pleas of not guilty.

Defendant's motion to set aside the information, made pursuant to section 995 of the Penal Code, was denied. Defendant's motion for a judgment of acquittal, made pursuant to section 1118.1 of the Penal Code, was denied. Trial was by jury.[2] The jury found defendant guilty as charged.

Criminal proceedings were adjourned and, pursuant to Penal Code section 1203.03, defendant was ordered delivered to the custody of the Director of Corrections for a diagnostic study. Upon return to court, probation was denied and defendant was sentenced to state prison for the term prescribed by law on the nine felony counts (VII, IX, XI, XVII, XIX, XXII, XXVII, XXIX and XXXI). The sentence on count VII was ordered to run consecutively with the sentence on count XXVII; all of the other felony counts were ordered to run concurrently with counts VII and XXVII.

Defendant was ordered imprisoned in county jail for the term of one year on the misdemeanor counts. Those counts numbered XXI and lower were ordered to run concurrently with each other and with count VII, to be served in state prison. All misdemeanor counts XXIII and higher were ordered to run concurrently with each other and concurrently with count XXVII, and also to be served in state prison.

Defendant has appealed from the judgment of conviction.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]Health and Safety Code section 11154 provides: "Except in the regular practice of his profession, no person shall prescribe, administer, dispense, or furnish, a controlled substance to or for any person who is not under his treatment for a pathology or condition other than addiction to a controlled substance, except as prescribed in this division."

[2]A first jury deadlocked and a mistrial was declared; the second jury heard evidence on the 35 counts after two informations were consolidated for trial on the People's motion and without objection by defendant.

I

*A Summary of the Evidence*

Since defendant has challenged the sufficiency of the evidence to support his conviction as one attack upon his conviction, we briefly summarize the evidence adduced below. In essence, the prosecution sought to prove that, from April 2, 1975, through May 7, 1976, nine undercover agents—representing different investigative agencies—visited defendant's office at 6213 South Main Street in Los Angeles and obtained from him prescriptions for Ritalin, Nembutal, Empirin Codeine, and Quaaludes, all of which were controlled substances.[3]

On April 2, 1975, Investigator Voveris went to defendant's office at about 6:30 a.m. and found two persons already waiting there. By 8:30 a.m., there were 15 people in line. By 9:30 a.m., the office was opened by Ronald Ransom, an employee of defendant, at which time there were 50 people in line. Ransom had the waiting persons "sign in" on a clipboard roster. Voveris signed in; he was not asked to provide identification nor was there any discussion with Ransom of any medical complaint Voveris had. Voveris was called by name and number at 12:30 p.m. Although this was his first visit to the office, he filled out nothing by way of patient information or a record of medical complaints. Voveris went into defendant's office where defendant, dressed in a white smock, was seated behind a desk. The room was approximately five by ten feet, and contained no medical equipment. Defendant introduced himself and Voveris asked for a prescription for Ritalin. Defendant asked him his name and for identification; Voveris gave him his driver's license. Defendant then completed a three-by-five card with Voveris' name, address, birthdate, and the present date. Voveris also asked for a prescription for Nembutal. Defendant asked no further questions, but gave Voveris the prescriptions for Ritalin (100) and Nembutal (30). Voveris asked how much he owed, and was told $3. Voveris paid this amount to defendant.

Voveris was followed into the doctor's office by Undercover Agent Tucker, who asked for Desoxins and Ritalin. The defendant stated that

---

[3]The agents worked for the Department of Consumer Affairs, the Labor Commissioner, the California Board of Medical Quality Assurance, the Bureau of Narcotics Enforcement, the Department of Justice, the Los Angeles Police Department, and the State Board of Medical Examiners.

Tucker could not have both, and would have to choose one or the other because they were both "uppers." Tucker chose Ritalin; defendant wrote a prescription for Ritalin, and, pursuant to Tucker's request, wrote prescriptions for Empirin Codeine and Quaaludes as well. Tucker also paid defendant $3. Tucker saw another room at the office during his visit, a room which appeared to be an examining room and contained a scale. Tucker did not voice any physical complaint to defendant while they transacted their business.

That same day Undercover Agent Yeary signed in at defendant's office and asked defendant for various drugs. Defendant asked what the drugs were for; Yeary responded: "No particular reason." Yeary was given prescriptions for the drugs he sought. Throughout the following months, other agents visited defendant and obtained prescriptions without undergoing any medical examination or discussion of any physical complaints. Ransom told one agent that defendant saw 60 people a day. The only change in procedure noted by the investigators as time went on was that the price paid increased from $3 to $5.

When Agent Coburn visited defendant, she asked for Ritalin. Defendant stated to her that she did not appear to be depressed; she replied: "Well, we all like to get up once in awhile." Some of the agents' conversations with defendant were secretly tape recorded by them and the tapes (and transcripts thereof) were admitted into evidence at the trial.

The prosecution presented the testimony of Dr. Ronald Okun, chief of research in clinical pharmacology at Cedars-Sinai Hospital, and an associate professor of medicine and pharmacology at UC Irvine and UCLA. Dr. Okun combined research, teaching and treatment in the field of drugs. He testified as to the characteristics of various controlled substances. Ritalin, he stated, is used for the very limited purpose of treating minimal brain disfunction in children. Nembutal, a brand name for phenobarbital, is used to combat sleeplessness. Both Nembutal and Quaaludes are depressants, and their use is contraindicated under certain circumstances.

Dr. Okun declared that he was familiar with the standard of practice in the medical community; that a minimal standard involved communication with the patient concerning physical complaints, an attempt to find the cause of the symptoms by taking a medical history, and a physical examination directed toward finding a cause for the symptoms and ruling out contraindications for the use of certain drugs. These proce-

dures, said Dr. Okun, were ordinarily employed by physicians before prescribing drugs.

Defendant testified in his own behalf. He had obtained a degree in osteopathy in 1960 before coming to California. His practice at the South Main address was at first general; then became a maternity practice; then became oriented toward surgery; and, finally, was "emotionally oriented" although he was not a psychiatrist. Defendant declared that he had prescribed drugs for Voveris and Tucker because they had told him they had drinking problems. Other agents had indicated problems with sleeplessness, back strain or overweight. Some of the agents he did not remember. He explained the tape recordings by stating that "you can do anything with electronics."

## II

### *Sufficiency of the Evidence*

Contrary to defendant's contention on appeal, the evidence of defendant's violations of Health and Safety Code section 11154 was persuasive and overwhelming. Viewing all of the evidence—defense and prosecution—clearly justified defendant's conviction. We must conclude that any rational trier of fact could find that each element of every offense charged against defendant was proved beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

## III

### *The Constitutionality of Health and Safety Code Section 11154*

Defendant contends that section 11154 of the Health and Safety Code is too vague, uncertain and indefinite to provide a standard by which a trier of fact may determine a defendant's guilt, and, therefore, is unconstitutional as a denial of due process of law. Defendant argues specifically that the language set forth in the section, "except in the regular practice of his profession," and "not under his treatment for a pathology or condition," can have no meaning to a juror since it cannot be derived from the juror's ordinary experience.

Generally, "[s]tatutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears [citation]. Mere

difficulty in ascertaining the meaning of the statute . . . will not render it nugatory . . . ." (*People v. Anderson* (1972) 29 Cal.App.3d 551, 561 [105 Cal.Rptr. 664] (upholding Health & Saf. Code § 11162.5 in the face of constitutional challenge).)

■ It is true, of course, that "[t]he requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law . . . . 'All are entitled to be informed as to what the State commands or forbids' . . . ." (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116]; see, also, *People v. McCaughan* (1957) 49 Cal.2d 409 [317 P.2d 974].) However, sufficient warning is all that is constitutionally required; and sufficient warning is present if the statutory language makes it reasonably certain as to what is prohibited. (*People v. Superior Court (Hartway)* (1977) 19 Cal.3d 338 [138 Cal.Rptr. 66, 562 P.2d 1315].)

Another general principle which is applicable here is that "'[t]he required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from *any demonstrably established technical* or common law meaning of the language in question.'" (*People v. Belous* (1969) 71 Cal.2d 954, 960 [80 Cal.Rptr. 354, 458 P.2d 194].) (Italics added.)

■ We perceive present section 11154 of the Health and Safety Code as reasonably certain on its face. But any lingering doubt as to the meaning of the language employed therein was dispelled by the testimony of drug expert, Dr. Okun, concerning the minimal standard employed by medical practitioners in writing prescriptions for controlled substances. The defendant wrote prescriptions for persons he knew nothing about, for reasons having nothing to do with "treatment." Section 11154 clearly prohibits such conduct in providing that "[e]xcept in the regular practice of his profession, no person shall prescribe, administer, dispense, or furnish, a controlled substance to or for any person who is not under his treatment for a pathology or condition other than addiction to a controlled substance, . . . "

We observe also that section 11154's predecessor, former Health and Safety Code section 11163, employed substantially similar language. In *People v. Braddock* (1953) 41 Cal.2d 794, 801 [264 P.2d 521], it was explained that "[t]he apparent purpose of section 11163 is to regulate the conduct of those persons who, in the practice of their professions,

have access to legitimate sources of narcotics. The responsibility of such a practitioner is to prescribe narcotics for legitimate medical purposes. . . . [The section] . . . seeks instead to prevent one having access to narcotics from making them available, other than for a legitimate purpose, to one under treatment for a pathology."

In *People* v. *Nunn* (1956) 46 Cal.2d 460 [296 P.2d 813], former section 11163 was upheld against constitutional attack based on the beginning language, "[e]xcept in the regular practice of his profession." The *Nunn* court concluded that "the 'regular practice of his profession' is a term clearly to be understood from the statutes, and it is well enough known to enable a person practicing as a physician and surgeon to understand and apply it. Therefore, section 11163 of the Health and Safety Code is constitutional." (*Id.* at p. 467.)

We perceive the *Nunn* reasoning equally applicable and persuasive in the case at bench. We therefore hold that section 11154 of the Health and Safety Code is immune from constitutional attack.

IV

*There Was No Instructional Error*

◼ Defendant contends that the trial court erred in refusing to give an instruction offered by him which set forth in detail the factors that could be considered by the jury in determining whether violations of Health and Safety Code section 11154 had occurred. The instruction requested by defendant was as follows: "Whether or not the Defendant acted in the course of the regular practice of his profession is a question of fact for you to decide. [¶] In deciding this question you may consider any matter that has a tendency in reason to show what constitutes the regular practice of his profession including but not limited to the following: [¶] (1) Whether or not the patient prescribed for was seen by the Doctor; [¶] (2) The extent of any physical or visual examination; [¶] (3) Expert testimony relative to regular procedures and practices; [¶] (4) Quantity of drug prescribed; [¶] (5) Nature and effect of drug prescribed; [¶] (6) The amount of fee charged by the Doctor in comparison to his customary fee and the customary fee charged by others in the same profession."

One instruction given by the court was a modification of the statute —section 11154. This instruction was as follows: "Pursuant to Section

11154 of the Health and Safety Code, of the State of California, every person who prescribes a controlled substance to or for any person who is not under his treatment for a pathology or condition and does so not in the regular practice of the medical profession is guilty of a crime." In addition, the court instructed the jury that "[w]hether or not the Defendant acted in the course of the regular practice of his profession is a fact for you to decide in the light of all the evidence." These two instructions adequately covered the issue of whether defendant was, or was not, acting in the regular practice of the medical profession. The requested more detailed defense instruction on this point was not required. (See *Anderson, supra*, 29 Cal.App.3d 551, 563, fn. 8.)

## V

### Was There a Violation of Evidence Code Section 352 in the Court's Rulings Admitting Certain Evidence?

Defendant contends that the trial court abused its admittedly broad discretion in admitting certain evidence, over objections that its prejudicial effect outweighed its probative value. (Evid. Code, § 352.) ■ It is well recognized that there must be a clear abuse of discretion before an appellate court will disturb a trial court's ruling based on Evidence Code section 352. (See *People v. Ott* (1978) 84 Cal.App.3d 118, 128 [148 Cal.Rptr. 479].) We find none here.

### A. *Dr. Okun's Testimony*

■ The medical testimony of Dr. Okun was clearly relevant to establish minimal requirements for "good faith" medical practice, including such basics as giving a physical examination to a patient before prescribing "controlled substances." Evidence of defendant's failure to do so, coupled with his lack of interest in any physical complaints of his patients rendered highly probative the medical testimony concerning standard practice in the community. Clearly, any potential for undue prejudice to defendant was substantially outweighed by the probative value of such evidence.

### B. *The Admissibility of the Tape Recordings of Conversations Between Defendant and Undercover Agents*

■ The main thrust of defendant's argument against admissibility of the tape recordings is directed at the fact that portions of the tapes

were unintelligible. This incompleteness, defendant asserts, caused the probative value of such tapes to be substantially outweighed by their prejudicial effect under Evidence Code section 352. The theory of prejudice is predicated on an assumption that the unintelligible portions *probably* contained matter that was exculpatory of defendant's guilt.

We point out initially that in the instant case, witnesses to the conversations with defendant provided the requisite authentication for the tape recordings made of those conversations. (*People* v. *Patton* (1976) 63 Cal.App.3d 211 [133 Cal.Rptr. 533]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 333 [23 Cal.Rptr. 779, 373 P.2d 867].) Having been duly authenticated, the tape recordings became admissible as defendant's admissions (Evid. Code, § 1220) unless the element of incompleteness destroyed their relevancy. To be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness. We do not find a sufficient degree of unintelligibility or incompleteness in the tape recordings presented in the case at bench to render them irrelevant and inadmissible. In addition, we reject defendant's assumption—not supported by the record—that the unintelligible portions contained exculpatory matter.

### C. *Evidence of the Long Lines of Patients at Defendant's Medical Office*

Defendant contends that the undercover agents should not have been permitted to testify regarding the size of the lines they observed at defendant's office on various occasions or the type of individuals they saw in those lines. It is argued that such evidence was unduly prejudicial, leading to speculation on the part of the jury as to events outside the purview of the instant prosecution, possibly other uncharged violations, and at the very least, raised the issue of how defendant could treat so many individuals in any given day.

We have no doubt that such evidence was prejudicial to defendant, as is all evidence which is relevant to help establish guilt. Evidence Code section 352 recognizes that relevant evidence may be prejudicial by its very nature. This explains the concept of section 352 which authorizes a trial judge to exclude relevant evidence but *only* when its probative value is outweighed by the probability that such evidence will create a substantial danger of "*undue* prejudice." The key to application of that phrase of section 352 is the requirement of *undue* prejudice to the objecting party.

Evidence of the long lines of people standing and waiting at defendant's office tended to corroborate the undercover agents' testimony that defendant prescribed drugs for them without making physical examinations or obtaining any history of complaints that indicated a need for the drugs prescribed. We cannot conclude that the trial judge abused his discretion in ruling that the probative value of the evidence of long lines of people was *not* outweighed by any danger of *undue* prejudice to defendant.

## VI

### There Was No Constitutional Inadequacy of Trial Counsel

Defendant contends that he was deprived of his constitutional right to the effective assistance of counsel at trial because of his counsel's failure to argue that his prosecution was barred pursuant to the doctrine of collateral estoppel announced in *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622].

The "collateral estoppel" issue arose below, defendant asserts, due to the fact that, prior to the criminal trial, the legality of defendant's conduct was considered and determined at an administrative hearing conducted before the State Board of Medical Quality Assurance. After that hearing, the board concluded that defendant, while he had violated certain sections of the Business and Professions Code, had *not* violated Health and Safety Code section 11154, the section involved in the case before us. We are urged to hold that this administrative determination of innocence should have shielded defendant from the subsequent criminal prosecution on the ground that the same issue had already been litigated to conclusion elsewhere, and that counsel's failure to pursue this matter below demonstrated inadequacy of representation.

In *Taylor, supra*, the California Supreme Court stated that "[c]ollateral estoppel has been held to bar relitigation of an issue decided at a previous trial if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial." (12 Cal.3d 686, 691.)

The *Taylor* court applied the doctrine as stated to bar the prosecution of the defendant in a criminal case where the guilt of the defendant was dependent solely upon the guilt of another defendant, acquitted in a previous trial. The court was careful to emphasize the limited nature of its ruling.

We do not perceive the administrative hearing concerning defendant's professional conduct as a "trial" in the sense intended by *Taylor*. The objective of that proceeding was policing licensing requirements rather than making a determination of criminal guilt or innocence. While administrative hearings employ fact-finding methods that are similar to those employed in criminal trials, the standards of admissibility of evidence differ and the objectives sought are not identical. In addition, the California Constitution (art. I, § 16) protects the right to a jury trial for both prosecutors and defendants alike. To apply collateral estoppel in situations such as that presented here would obviously defeat that constitutionally mandated protection. Hence, we reject the application of the doctrine in the situation presented here.

It follows that trial counsel was not failing to provide effective assistance to defendant when counsel failed to seek application of the collateral estoppel doctrine below. As *People v. Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859], tells us, federal and state constitutional rights to counsel are satisfied if defendant's representation is by a "reasonably competent attorney acting as a diligent conscientious advocate." Defendant bears the burden of demonstrating that counsel deviated from this standard and thereby deprived defendant of "a potentially meritorious defense." (*Id.* at p. 425.) Since it is clear that no potentially meritorious defense was withdrawn as the result of the claimed omission, defendant's contention of inadequate representation must fail.

We find no merit in any of defendant's contentions.

The judgment is affirmed.

Files, P. J., and Burke (M. L.), J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 11, 1980.

---

*Assigned by the Chairperson of the Judicial Council.