[No. B075043. Second Dist., Div. Seven. July 23, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRYL POLK et al., Defendants and Appellants.

[No. B100728. Second Dist., Div. Seven. July 23, 1996.]

In re DARRYL POLK, on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to *California Rules of Court,* rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, IV, V and VI.

**COUNSEL**

Robert Derham and George L. Schraer, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Darryl Polk and Tony Leater appeal from the judgments entered following separate jury trials in which they were convicted of two counts each of first degree murder and robbery and of one count of first degree burglary, all with the use of a firearm. (Pen. Code, §§ 187, 211, 459, 12022.5, 12022, subd. (a).)[1] The jury further found true as to each appellant special circumstances that the murders occurred during the commission of robbery and burglary and that each appellant committed multiple murders. (§ 190.2, subd. (a)(3) & (17).) In addition, the jury found true the allegations appellant Polk had suffered three prior felony convictions and the trial court found appellant Leater had suffered two prior felony convictions. (§§ 667, subd. (a), 667.5, subd. (b).)

On appeal appellants contend[2] admission of an unintelligible tape recording and the prosecution's transcript purporting to transcribe the recording deprived them of a fair trial; admission of the transcript violated several provisions of the Evidence Code; evidence of uncharged offenses constituted prejudicial error; and, the special circumstance findings must be reversed because the trial court failed to define sua sponte the phrase "reckless indifference to human life" and the instructions did not specify intent to kill is a required element of the multiple-murder special circumstance. We reject appellants' contentions of error and affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] To the extent applicable, appellants join in each other's contentions. Thus, for convenience this opinion refers to both appellants collectively except where an issue relates to only one of the appellants.

Appellant Polk has also filed a petition for writ of habeas corpus which we agreed to consider with his appeal. He contends the prosecution's transcript constituted false evidence. In addition, he claims trial counsel rendered ineffective assistance of counsel by failing to retain an expert to prepare a transcript of the tape, by failing to investigate the original and enhanced tapes and by failing to implicate the key prosecution witness in the crimes. We conclude the petition does not state a claim for relief and deny the writ.

## FACTS AND PROCEEDINGS BELOW

At approximately 3 a.m. on February 13, 1991, a passerby found the bodies of Tanee Yemsvat and his wife Kemika Seaeow in the back of their white Mustang hatchback parked in the underground garage of their apartment building. Yemsvat's hands and feet were "hog tied" with nylon cord. He had been shot three times in the head and three times in the back at close range. A Gap brand denim jacket covered his head and face. Seaeow's wrists were bound with cord. She had been shot twice in the head. Blood and gasoline dripped from the car onto the garage floor.

Yemsvat's pockets were turned inside out. Neither Yemsvat nor Seaeow wore shoes. A gold chain from which a Buddha pendant usually hung around Yemsvat's neck was found on the garage floor beneath the car. A short distance from the car police found a briefcase, packets of Extra brand chewing gum and a pair of broken earrings. Police also found an open package of Extra brand gum in Yemsvat's jacket pocket.

The victims' apartment had been ransacked. Closets were open and the contents of drawers dumped out. Yemsvat's size seven shoes were missing.

Bullets and casings recovered from the victims' bodies and from the car were from both .38- and .32-caliber guns. Officers found spent Fiocchi brand .32-caliber automatic casings in the car.

*The Leater Trial:*

In February 1991, Phina Mendoza was appellant Leater's girlfriend. About 8 p.m. on February 12, 1991, appellant Polk called and asked for Leater. He was not at home. Polk asked her to page Leater using his home phone number followed by the digits "911."

Between midnight and 12:30 a.m. Mendoza received a phone call from Leater. He said he and Polk were "on a mission." Leater said he was calling from a phone booth in a donut shop located in a strip mall where he and Polk

were following some people. After a few minutes Leater said he had to hang up because the couple was coming out of an insurance company and leaving in a car.

Between 2 and 2:30 a.m. Leater came home and woke Mendoza up. Leater dressed in black, wore gloves and a knit cap. Leater said he had a surprise for her. He asked how she would like a lady's Gucci watch and two beepers and threw these items on the bed. He asked how she would like $1,300 and threw down thirteen $100 bills. He showed Mendoza a Buddha pendant, a Fujitsu brand cellular phone and a blue duffel bag filled with men's size seven shoes. Leater wore size seven shoes.

Leater explained he and Polk had just "jacked," or robbed, and killed the two "oriental" people they had been following earlier in the evening. Leater removed a box of Fiocchi brand bullets from a drawer in the bedroom and reloaded his gun. Leater told Mendoza he and Polk followed the couple into their security underground parking garage. They took the couple upstairs to their apartment at gunpoint. Leater explained the robbery was prompted by a man who offered Polk $3,000 for the gold Rolex watch Yemsvat always wore.

Leater explained that after they robbed the couple they tied them up and put them into the back of their Mustang. Leater drove the car. Polk wrapped a gun in his denim jacket and emptied the gun into the man. According to Leater, Polk then took Leater's gun and emptied it into the woman. Leater told Mendoza he did not know Polk was going to kill the people and was surprised when he did.

After the shooting Leater drove the couple's Mustang back to the underground parking garage and left it there.

They next exchanged Yemsvat's gold Rolex watch for $3,000. Leater told Mendoza the man wanting the watch used to work at the victims' insurance company[3] but had recently been fired.

Leater and Mendoza went out for breakfast. Leater drove her past the scene of the crimes. Leater pointed out the strip mall where the victims' insurance company was located. He also pointed out the donut shop phone booth where he had called her earlier that evening while watching the couple. Leater also showed Mendoza where the couple lived.

A few days later Leater and Mendoza broke off their relationship. On February 24, 1991, Mendoza went to the police to tell them what she knew

---

[3] Kemika Seaeow managed the insurance business while Tanee Yemsvat operated another business elsewhere.

about the murders. Mendoza wore the stolen Gucci watch to the station, which she gave to the police. She also gave the police the victim's Buddha pendant and one of the pagers.

Appellants were arrested the next day. In a search of Leater's residence police found a partially used box of Fiocchi brand .32-caliber ammunition of the type found in the victims' bodies and car, a pager and a blue duffel bag containing men's size seven shoes. Documentation on the sole of the shoes and from the store established Yemsvat had purchased the pair of shoes using a credit card at Nordstrom a few months earlier.

Polk was arrested coming out of a market. At the time his English bull terrier was in the car. Hairs taken from the dog and Polk's car bore substantial microscopic similarities to dog hairs found on the passenger seat and in the hatchback portion of the victims' car.

When arrested police took appellants to a police facility on Spring Street. Detectives intended to transport them to Parker Center for booking. Police placed appellants in the backseat of a police car. Earlier, Detective Arron Martin had activated a cassette recorder in the police car. Appellants were left alone in the car for approximately 30 minutes.

Appellants' conversation was recorded. Much on the tape was inaudible or difficult to understand. After Detective Martin had the tape enhanced twice he prepared a transcript of appellants' conversation. They talked about their arrests, the searches of their homes, and the detectives who attempted to interview them unsuccessfully. Appellants discussed personal matters as well as matters pertaining to the crimes with which they were charged. The jury used the transcript prepared by Detective Martin when the tape was played during the trial. According to the transcript Leater asks Polk "how many shots he got off" and Polk answers "four." When Leater says, "the gun holds five," the men laugh. Later Leater comments that if the police had the guns they would be booked. When Polk asks Leater if the police found the shoes during the search, Leater confirms they did. The men mention the police accused them of double murder. They discuss a sentence of 25 years to life. Then Leater mentions special circumstances. When Polk asks what "special circumstances" means, Leater responds it means the death penalty and death row.

Police never recovered the guns used in the killings nor the victims' Fujitsu cellular phone. However, several calls were made on the phone after the victims' death. One of the calls made within minutes of the murders was to Edna Tavares's residence. Tavares was originally a friend of Leater's whom Polk came to know and called occasionally.

Police recovered no fingerprints from any of the victims' belongings.

Leater's defense was alibi. Camala and John Johnson testified Leater was with them working on a car that evening until 1:30 or 2 a.m. Previously, John Johnson told investigators Leater left at 10 or 10:30 p.m. In addition, an employee of the building where the victims lived testified he saw Yemsvat in the garage on February 12, 1991, with a Black male and a female. He heard arguing and a woman singing.

*The Polk Trial:*

Evidence concerning the facts of the crimes was substantially the same as that presented at Leater's trial. However, Mendoza was precluded from testifying to Leater's statements to her concerning Polk's involvement.

Mendoza identified the denim jacket found with the victims as resembling one belonging to Polk. Between 8 and 8:30 p.m. on the night the crimes occurred Polk called for Leater. Polk asked Mendoza to have Leater page him using his home phone number followed by the code "911" to indicate an urgent message. After the crimes Polk called Mendoza looking for Leater. He told her he was looking for an apartment now that he had money. In yet another telephone conversation, Polk called looking for Leater, who was not at home. Polk told Mendoza to have him call, "but not to use that phone." At 2:03 a.m. on the morning of the murders the victims' phone had been used to call Edna Tavares, a woman Polk had recently met and called on occasion. After the crimes Polk called her and wrote her a letter from jail.

At trial Polk tried on the bullet-riddled denim jacket found covering the victims' heads. Apparently, the jacket fit Polk perfectly.

Both Tavares and Mendoza had seen Polk in possession of a handgun the month before the murders.

When Polk was arrested he had his dog in the car. Hairs taken from Polk's dog bore substantial microscopic similarities to dog hairs found in his car and found in the passenger and hatchback portion of the victims' Mustang. Police retrieved a pair of gloves and a pair of binoculars from Polk's car.

Polk's defense was also alibi. His mother and sister testified Polk was home sleeping at the time the crimes were committed.

At trial the defense presented its version of the tape of appellants' conversation in the back of the police car when arrested. The transcript of

the tape prepared by the defense is similar to the transcript prepared by Detective Martin. However, in some respects the defense's version contains fewer incriminating remarks than does the prosecution's version. In addition, in the transcript prepared by the defense it is instead Polk who asks Leater how many shots he got off.

DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *It Was Not Error to Admit the Tape and Transcript Into Evidence.*

 Appellants contend they were deprived of their right to a fair trial by the trial court's erroneous admission into evidence of the unintelligible portions of a tape recording of their conversation in the back of the police car. In addition, appellants contend the trial court compounded the error by admitting a transcript into evidence which purported to transcribe the unintelligible portions of the tape. They claim these errors require reversal of their convictions.

A. *The Trial Court Did Not Abuse Its Discretion in Admitting the Tape Into Evidence.*

After Detective Martin retrieved the cassette recorder from the police car he listened to it on a regular cassette player. He found much of appellants' conversation on the tape inaudible, unintelligible or drowned out by traffic noise and car horns. He had the tape enhanced twice to clarify the voices and to remove extraneous noise. Thereafter, he spent over 40 hours listening to the tape on various types of sophisticated sound equipment in order to prepare a transcript of appellants' conversation. When he completed a draft transcript an investigator for the district attorney's office also listened to the tape to determine the accuracy of Detective Martin's transcript. The men had differences of opinion regarding various aspects of the tape, and the men attempted to reach a consensus before finalizing the transcript.

Prior to trial appellants moved to exclude the tape and transcript. After listening to the tape twice while using the prepared transcript the trial court denied their motion. However, the trial court pointed out it could hear certain words and phrases which did not appear in the transcript and could not hear others phrases which did. In addition, the trial court found the last part of the

---

*See footnote, *ante*, page 944.

tape and transcript was irrelevant to the case and unduly prejudicial. The trial court requested the parties to reach agreement on the portions which the trial court indicated should be excluded.

The transcript the prosecution used at trial excludes the prejudicial matter at the end of the tape. The transcript also employs asterisks or the phrases "inaudible" or "unintelligible" to indicate those portions of the tape which are garbled or unintelligible.

Appellants renewed their motions as their trial dates approached. Again the trial court ruled the evidence contained information relevant to the case and found the probative value of the tape as edited exceeded any prejudicial effect. Appellants renewed their motions on at least two subsequent occasions. Each time the trial court exercised its discretion to admit the tape and to permit the jury to use the transcript prepared by Detective Martin as an aid while listening to the tape.[4]

When the tape was played during trial the trial court instructed the jury the tape was the evidence and the transcript was only to be used as an aid in determining what was actually said on the tape.

" 'To be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness.' (*People* v. *Demery* (1980) 104 Cal.App.3d 548, 559 [163 Cal.Rptr. 814]; *People* v. *Miley* (1984) 158 Cal.App.3d 25, 36 [204 Cal.Rptr. 347] [tape recording containing unintelligible parts was not unduly prejudicial as admitted]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 78 [222 Cal.Rptr. 127, 711 P.2d 423] [letters held admissible because the letter's clear meaning was not affected by the unintelligible parts]; *People* v. *Finch* (1963) 216 Cal.App.2d 444, 454 [30 Cal.Rptr. 901] [recording admissible absent a showing that any statement was a misstatement or that material statements were missing].)" (*People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 225 [15 Cal.Rptr.2d 112] [tape recording of prison conversation containing numerous gaps and unintelligible portions properly admitted because audible portion was clearly relevant to the case].)

Thus, a partially unintelligible tape is admissible unless the audible portions of the tape are so incomplete the tape's relevance is destroyed. (See,

---

[4]Appellants' claim the trial court failed to exercise its discretion under Evidence Code section 352 in admitting the tape is emphatically and repeatedly undermined by the record in this case. (See *People* v. *Miley* (1984) 158 Cal.App.3d 25, 36-37 [204 Cal.Rptr. 347] [trial court properly reviewed tape and compared tape to transcript prior to admission into evidence].)

e.g., *People* v. *Demery* (1980) 104 Cal.App.3d 548, 559 [163 Cal.Rptr. 814]; see also Annot., Admissibility of Inaudible Sound Recording (1974) 57 A.L.R.3d 746, 750 [finding rule in most jurisdictions is partial, or partially audible tape, is admissible unless its defects are so substantial as to leave the recording without probative value].) The fact a tape recording "may not be clear in its entirety does not of itself require its exclusion from evidence 'since a witness may testify to part of a conversation if that is all he heard and it appears to be intelligible.' (*People* v. *Porter*, 105 Cal.App.2d 324, 331 [233 P.2d 102].)" (*People* v. *Curtis* (1955) 134 Cal.App.2d 624, 627 [286 P.2d 446]; accord, *People* v. *Cash* (1970) 28 Mich.App. 1 [184 N.W.2d 216] [because a live witness may testify as to so much of a conversation as he heard, a partially audible tape recording is equally admissible]; see also cases collected in Annot., Admissibility of Inaudible Sound Recording, *supra*, 57 A.L.R.3d 746 and Annot., Admissibility of Sound Recordings in Evidence (1958) 58 A.L.R.2d 1024, 1038-1039.)[5]

"There can be no doubt that before permitting recordings to be played to the jury the court should satisfy itself that they are substantially complete and substantially correct as to matters that are material and important. It is a matter that must be left to the discretion of the court." (*People* v. *Finch* (1963) 216 Cal.App.2d 444, 453 [30 Cal.Rptr. 901].)

 Here the trial court listened to the tape recording and satisfied itself the tape contained sufficient audible portions of matters having a material and important bearing on the case prior to finding the tape admissible.

This court has also listened to the tape recording. On first hearing the tape was very difficult to understand. Once acclimated to the voices, background noise and the like, it is our opinion the tape contains several audible portions which are understandable even without the aid of a transcript. Certain of these audible portions relate to matters clearly relevant to this case. Accordingly, we find the trial court did not abuse its discretion in admitting the partially audible tape into evidence. (See, *People* v. *Von Villas*, *supra*, 11 Cal.App.4th at pp. 225-226.)

B. *The Transcript of the Tape Was Properly Admitted Into Evidence.*

Appellants contend the trial court increased the risk of prejudice to their cases from the inaudible tape by permitting the prosecution to give copies of

[5]Commentators have acknowledged recordings can be powerful, reliable and efficient evidence. For this reason some argue for stricter foundational standards for admission into evidence to ensure authenticity and against tampering. (See, e.g., discussion in Note, *A Foundational Standard for the Admission of Sound Recordings into Evidence in Criminal Trials* (1979) 52 So.Cal.L.Rev. 1273.)

its transcript to the jury while they listened to the tape. They claim the People's transcript contained several inaccuracies in both determining the words actually spoken and in ascribing certain words to a given speaker. Appellants urge use of the transcripts was error because the tape was so unintelligible the jury probably overemphasized the value of the transcript and this created a risk the transcript, rather than the tape, became the evidence.

Appellants cite the decision in *United States* v. *Robinson* (6th Cir. 1982) 707 F.2d 872 in support of their argument admission of the tape into evidence constituted a prejudicial abuse of discretion. In *Robinson* the court established a rule for the Sixth Circuit to ensure accuracy and fairness when ruling on the use of transcripts of tape recordings. The court suggested: (1) the parties should stipulate to the accuracy of the transcript; or, (2) the trial court should make a pretrial determination of accuracy by reading the transcript against the tapes; or, (3) the parties could present two transcripts to the jury, the prosecution's and defense's version. In addition, the court suggested the word "inaudible" should be inserted in the transcript in order to preclude jury speculation regarding unintelligible portions of the tape. (707 F.2d at pp. 876-877.)

In *Robinson* both the trial court and appellate court noted innumerable inaccuracies in the transcripts. (707 F.2d at p. 878.) In addition, the transcript purported to translate and transcribe inaudible portions of the tape. The appellate court found the tapes so inaudible as to preclude transcription. (707 F.2d at p. 879.) The *Robinson* court found in these circumstances even two versions of the tape would not have assisted the jury, but might have inspired wholesale speculation and confusion.

The Sixth Circuit reversed the convictions. The tape recordings were the primary evidence against the defendants. In addition, the trial court had failed to employ any of the enumerated safeguards to ensure the accuracy of the transcripts. (707 F.2d at p. 879; see also *People* v. *Wilson* (1992) 182 A.D.2d 734 [582 N.Y.S.2d 462] [conviction reversed because only audible portion of tape pertained to irrelevant matter and trial court permitted jury to use transcript prepared by a party to the conversation which was based on his memory of the event rather than the recording]; cf. *United States* v. *Mazza* (1st Cir. 1986) 792 F.2d 1210, 1226 [trial court need not verify accuracy of transcript before allowing jury to use government-prepared transcript as an aid to understanding a tape recording]; *United States* v. *Collazo* (4th Cir. 1984) 732 F.2d 1200, 1203 [same].)

While the decision in *United States* v. *Robinson, supra*, 707 F.2d 872 is not binding precedent on this court, it is interesting to note the actions the trial

court took in this case virtually tracked every recommended procedure outlined by the *Robinson* court. The trial court listened to the tape several times to compare the tape to the transcript prepared by the prosecution. After hearing the tape the trial court ordered the irrelevant and prejudicial portions deleted. The trial court also directed the parties to meet and agree on those portions of the transcript which should be deleted or replaced with asterisks or the word "inaudible" or "unintelligible." The trial court also recommended the defense prepare a transcript representing its version of the tape recording. The defense in Polk's trial adopted the suggestion and prepared and submitted its version of the tape. The jury was permitted to compare the different versions while listening to the tape. Apparently, both the Leater and Polk juries listened to the tape many times during deliberations, indicating they did not blindly adopt as accurate the People's transcription of the tape.

As noted, this court has also listened to the tape several times and has compared the different transcripts to the recording. Also, as noted, not all the words were equally audible or distinguishable on the initial hearing. However, when played several times words and phrases became more and more distinguishable and understandable. This was the justifiable purpose of the transcript. (See, e.g., *People* v. *Albert* (1960) 182 Cal.App.2d 729, 742 [6 Cal.Rptr. 473].)

Concededly, there appear to be inaccuracies in both the People's and defense's version of the tape recording. The differences may be simply a matter of interpretation or a question of the quality of the recording devices used. Nevertheless, it is our opinion the transcript prepared by the prosecution was sufficiently accurate in material respects to justify its use by the jury. In our view the inaccuracies do not detract sufficiently from the overall accuracy of the transcript to call into question the reliability of the entire transcript.

Moreover, it has been held "[t]ranscripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." (*People* v. *Brown* (1990) 225 Cal.App.3d 585, 599 [275 Cal.Rptr. 268], citing *People* v. *Fujita* (1974) 43 Cal.App.3d 454, 472-473 [117 Cal.Rptr. 757].) The transcript prepared by the prosecution did not present this type of risk. The clearly audible portions were at least as damaging as were other less audible incriminating portions challenged by appellants as inaccurate. For example, in a clearly audible portion of the tape Leater asks Polk how many shots he got off. The People's transcript accurately ascribes this question to Leater. This exchange is sufficiently material by itself to make the other alleged inaccuracies less significant.

In sum, the trial court did not abuse its discretion in admitting the People's transcript of the tape recording based on its finding it was substantially complete and accurate.

IV.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments of conviction are affirmed. The petition for writ of habeas corpus is denied.

Lillie, P. J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 13, 1996.

---

*See footnote, *ante*, page 944.