[No. A059233. First Dist., Div. Three. Feb. 18, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
BHUPAT SANGANI et al., Defendants and Appellants.

## COUNSEL

McDonough, Holland & Allen and Richard M. Ross for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Roderick E. Walston, Chief Assistant Attorneys General, Ronald A. Bass and Theodora Berger, Assistant Attorneys General, Laurence K. Sullivan, Juliet Haley and Edwin F. Lowry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHITE, P. J.**—Defendant Bhupat Sangani is the owner and operator of Leedy Plating Corporation,[1] a metal plating plant located on San Leandro Street in Oakland. Both Sangani and Leedy Plating were charged by information with six criminal violations of the California Hazardous Waste Control Act (hereafter the Hazardous Waste Act). (Health & Saf. Code,[2] § 25100 et seq.; Cal. Code Regs., former tit. 22, § 66001[3] et seq.) The Hazardous Waste Act regulates the transportation and disposal of hazardous waste in California and imposes criminal liability for violation of certain of its provisions. (§§ 25189.5 to 25191; *People* v. *Martin* (1989) 211 Cal.App.3d 699, 703 [259 Cal.Rptr. 770, 86 A.L.R.4th 383].)

The prosecution case focused on two felony violations of the Hazardous Waste Act. First, the evidence showed that Sangani or his employees surreptitiously dumped hazardous waste from Leedy Plating directly into the East Bay sewer system. This was a violation of section 25189.5, subdivisions (a) and (b), which prohibit the disposal of any hazardous waste at a nonpermitted facility.[4] Second, the evidence established that Sangani recklessly stored cyanide-laced liquid waste in an open tank on a public sidewalk. This was a violation of section 25189.6, subdivision (a), which prohibits a person from storing or handling any "hazardous waste in a manner which cause[s any] unreasonable risk of fire, explosion, serious injury, or death." In addition, defendants were charged with, and found guilty of, three misdemeanor violations of the Hazardous Waste Act.[5]

---

[1] In the record, Leedy Plating is sometimes referred to as American Electrofinishing, which was a prior name.

[2] Unless otherwise indicated, all further statutory references are to the Health and Safety Code.

[3] Hereafter, referred to as "title 22" or "tit. 22" followed by the appropriate section number. Unless otherwise noted, the regulations cited were in effect at the time of the offenses, but were superseded in 1991. (See Cal. Reg. Notice Register 91, No. 23-Z, p. 760.)

[4] Section 25189.5, subdivisions (a) and (b) provide: "(a) The disposal of any hazardous waste, or the causing thereof, is prohibited when the disposal is at a facility which does not have a permit from the department issued pursuant to this chapter, or at any point which is not authorized according to this chapter. [¶] (b) Any person who is convicted of knowingly disposing or causing the disposal of any hazardous waste, or who reasonably should have known that he or she was disposing or causing the disposal of any hazardous waste, at a facility which does not have a permit from the department issued pursuant to this chapter, or at any point which is not authorized according to this chapter shall, upon conviction, be punished by imprisonment in the county jail for not more than one year or by imprisonment in the state prison for 16, 24, or 36 months."

[5] The misdemeanor violations were for storing hazardous waste on site for more than 90 days (§ 25190; tit. 22, § 66508); accumulating hazardous wastes without properly labeling the storage drums (§ 25190; tit. 22, § 66508); and storing hazardous wastes without a secondary

Following defendants' bench trial, the trial court found defendants guilty of the charges outlined above and placed defendants on five years' probation and imposed a total of $400,000 in fines. This timely appeal followed.

## FACTS

On Monday morning, July 10, 1989, Pacific Gas and Electric employees reopened a trench they had dug the previous week on San Leandro Street in Oakland.[6] The workers had covered the trench the previous Friday with 3000-pound steel plates which they had welded together. At that time the trench was dry. However, when the workers reopened the trench on Monday morning they found approximately 300 gallons of an acidic smelling reddish liquid under a broken clay sewer pipe. The pipe had apparently broken over the weekend when a dirt "plug" the workers had left to support the pipe collapsed. The broken pipe led directly to the Leedy Plating shop. Dye tests showed that the sewer pipe was connected to an upstairs bathroom sink and toilet in Leedy Plating.

Law enforcement and hazardous materials specialists examined the trench and took samples of the liquid. The liquid was highly acidic (with a pH less than 2) and was consequently hazardous under California law. In addition, the liquid contained hazardous levels of chromium, cadmium, copper, nickel and zinc. Based on these findings, both defendants conceded the liquid was "hazardous" under California law.

The liquid found in the trench was consistent with waste rinses created in a plating shop. One would expect such wastes to contain each of the heavy metals found in the trench samples. Moreover, samples taken from one of the waste sumps at Leedy Plating on July 10, 1989, showed low metal levels indicating that the sump had recently been washed out. It would have been possible to have pumped the wastes from the sump into the sewer system through the upstairs bathroom fixtures.

Defendant Sangani had numerous prior contacts with Alameda County wastewater officials. Indeed, the wastewater officials had identified the sewer lateral leading to the upstairs bathroom as a possible point of surreptitious disposal of waste. Consequently, Sangani's wastewater discharge

---

containment system (§ 25190; tit. 22, § 67245). In addition, the defendants were acquitted of one felony violation of section 25189.5, subdivision (a).

[6]Appellants present a remarkably slanted statement of facts which focuses on the evidence favorable to the defense but virtually ignores much of the damning evidence presented by the prosecution. The felonies charged here were very serious crimes and amounted (in the words of the trial court) to "industrial terrorism." Appellate counsel's attempt to minimize and belittle the prosecution case does not serve his clients well.

permit specifically required that he seal that sewer lateral. Although Sangani reported that he had sealed this sewer lateral, he had not done so.

When emergency response personnel arrived at the scene on July 10, they also found an open metal tank (sometimes called a "dumpster" in trial testimony) on the public sidewalk adjacent to Leedy Plating. The tank contained about 18 to 24 inches of liquid. Trash—which might have been thrown in by passers by—was floating on the liquid. Test samples established that the liquid contained high concentrations of cyanide. One and one-half tablespoons of the liquid taken internally would kill an "average teenager" in 30 minutes. Moreover, the liquid could cause permanent damage if it were splashed in an eye.

Two Leedy Plating employees told police that the tank belonged to the shop. Mr. Sangani had directed one of the employees to put the tank outside during the previous week. A Pacific Gas and Electric employee who was working on the street remembered that the tank was on the sidewalk during the previous week, and Mr. Sangani's own daughter stated that the tank had been placed on the sidewalk the previous Friday and had therefore been outside over the weekend.

Inside the plating shop, investigators discovered numerous drums of what appeared to be stored hazardous waste. Many of these drums were either unlabeled or lacked a notation of the beginning accumulation dates. (See tit. 22, § 66508, subd. (a)(2), (a)(3).) In addition, some of the waste storage drums were not protected by a secondary containment system to catch overflow or spillage from the primary containers. (Tit. 22, § 67245.) Finally, there was evidence—discussed in greater detail later in this opinion—that hazardous waste had been stored at Leedy Plating for more than 90 days, in violation of title 22, section 66508.

*Defense*

The defense consisted of three primary prongs. First, defendants argued (through expert testimony) that the materials found in the dumpster/tank and inside the plating shop were not "waste" and consequently were not subject to regulation under the Hazardous Waste Act. Second, defendants presented evidence that the liquid found in the trench was chemically inconsistent with the wastes generated by Leedy Plating and that the liquid more likely came from a nearby (though long closed) steel processing plant. Finally, defendants contended that discharge of their hazardous waste directly into the sewer system was permitted by the "domestic sewage exception" under the *federal* Resource Conservation and Recovery Act, and, in any event, was not

a violation of section 25189.5 because the sewer led to a permitted facility (a publicly-owned sewage treatment plant).

The trial court resolved the legal issues and the conflicts in expert testimony against the defendants. Consequently, the court found defendants guilty of the two felonies (§§ 25189.5, subds. (a) and (b), 25189.6) and three misdemeanors (§ 25190) described above.

DISCUSSION

I

■ Defendants' primary contention on appeal is aimed at their felony conviction under section 25189.5 for dumping hazardous wastes into the East Bay sewer system. Simply put, defendants contend that the Hazardous Waste Act permits the discharge of hazardous wastes into a sewer system which is serviced by a publicly owned treatment works (POTW). This argument is based on the so-called "domestic sewage exemption" established by the federal analog to the Hazardous Waste Act (the Resource Conservation and Recovery Act (RCRA)), and on defendants' belief that a POTW is a permitted facility for receiving hazardous waste within the meaning of section 25189.5, subdivisions (a) and (b). We conclude that California has not adopted an unrestricted domestic sewage exemption, and that the POTW in this case is not a permitted facility for the purpose of accepting hazardous waste through sewage lines.

### A. The Domestic Sewage Exemption.

In order to understand defendants' argument, it is first necessary to briefly outline the law controlling industrial discharges to public sewers. In general, industrial discharges to public sewers are regulated by the federal Clean Water Act. The Clean Water Act establishes a permit system for point source discharges to surface waters, known as the National Pollutant Discharge Elimination System (NPDES). (2 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (1993) § 31.24[1], p. 31-35.) In California, NPDES permits are administered by the state. (Id., at §§ 31.24[1] & [2], pp. 31-35 to 31-37.) All point discharges to navigable waterways are regulated and require permits under the NPDES, including discharges of treated sewage by POTW's. (Elliott et al., Hazardous Materials Program Commentary: California (1988) p. C4 1 [hereafter Hazardous Materials Commentary].) Industrial users who discharge into sewers leading to POTW's are not required to obtain NPDES permits. However, POTW's are required to impose "pretreatment standards" on industrial users. These pretreatment

standards are necessary to protect the operation and integrity of the POTW's, and to ensure compliance with their own NPDES permits and discharge limitations.[7] Thus, the POTW's directly regulate the pollutants that an industrial user may discharge into the sewer system by enforcing pretreatment standards and monitoring the user's effluent to ensure compliance. (Hazardous Materials Commentary, *supra*, at pp. C4 1-2.)

Because the Clean Water Act regulates sewered industrial waste, the federal analog to California's Hazardous Waste Act—the RCRA[8]—excludes from its definition of "hazardous waste" "[a]ny mixture of domestic sewage and other wastes [including industrial wastes] that passes through a sewer system to a publicly-owned treatment works for treatment." (40 C.F.R. § 261.4(a)(1)(ii) (1992);[9] 42 U.S.C. §§ 6903(5), 6903(27); *U.S.* v. *Dee* (4th Cir. 1990) 912 F.2d 741, 748, fn. 16.) The rationale for this exclusion is that hazardous wastes discharged to POTW's will be comprehensively regulated under the pretreatment provisions of the Clean Water Act, thus making RCRA regulation redundant. (Hazardous Material Commentary, *supra*, at p. C4 3.)[10] However, as the materials defendants themselves have provided make clear, "many states have decided not to incorporate the domestic sewage exemption into their state programs." (Hall et al., RCRA Hazardous Wastes Handbook (9th ed. 1991) p. 2-10.) California is one of those states.

The federal RCRA program permits states to regulate hazardous wastes in a manner that is more stringent or more extensive than is required under federal law. (42 U.S.C. § 6929; 40 C.F.R. § 271.1(i)(1).) California's Health and Safety Code, section 25159.5, subdivision (b) provides that federal RCRA regulations shall be deemed to be the regulations of the state Department of Toxic Substances Control, "except that any state statute or regulation which is more stringent or more extensive than a federal regulation shall supersede the federal regulation." (*Acme Fill Corp.* v. *Reilly* (N.D.Cal. 1990) 735 F.Supp. 353, 355; *Liquid Chemical Corp.* v. *Department of Health Services*, *supra*, 227 Cal.App.3d at p. 1693; *People* v. *Martin*, *supra*, 211 Cal.App.3d at p. 708.) As we shall explain, California has chosen to regulate

---

[7]The pretreatment standards prevent the introduction of pollutants which would interfere with the POTW's equipment or operations, endanger personnel, pass through the system without being treated, or prevent the POTW from complying with its NPDES permit. (Hazardous Materials Commentary, *supra*, at p. C4 2.)

[8]See *Liquid Chemical Corp.* v. *Department of Health Services* (1991) 227 Cal.App.3d 1682, 1690-1691 [279 Cal.Rptr. 103].

[9]All further citations to the Code of Federal Regulations are to the 1992 code.

[10]We assume, without deciding, that an industrial user who dumps hazardous waste into a domestic sewer system in violation of its pretreatment standards would not be subject to criminal prosecution under the RCRA.

hazardous waste in a manner that is "more stringent [and] more extensive" than federal law by choosing *not* to adopt an unrestricted domestic sewage exemption.

In an effort to convince us that California has adopted the domestic sewage exemption, defendants cite the *current* California regulations which implement the Hazardous Waste Act. *Current* title 22, section 66261.4 adopts some—though not all—of the federal exclusions described in 40 Code of Federal Regulations, section 261.4. In particular, current title 22, section 66261.4 does *not* adopt 40 Code Federal Regulations, section 261.4(a)(1)(i) and (a)(1)(ii) (the domestic sewage exemption). (Cf. 40 C.F.R. § 261.4(a) and current tit. 22, § 66261.4, quoted in the margin.)[11] If there was any doubt on this issue, it has been laid to rest by the California Department of Health Services' "Final Statement of Reasons" for adopting

[11]Current title 22, section 66261.4, subdivision (a) provides: "(a) Materials which are not wastes. The following materials are not wastes for the purpose of this chapter: [¶] (1) industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the federal Clean Water Act, as amended (33 U.S.C. section 1342). This exclusion applies only to the actual point source discharge. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment; [¶] (2) source, special nuclear or by-product material as defined by the federal Atomic Energy Act of 1954, as amended, (42 U.S.C. section 2011 et seq.); [¶] (3) spent sulfuric acid used to produce virgin sulfuric acid, unless it is accumulated speculatively as defined in section 66260.10."

The companion federal regulation provides in pertinent part: "(a) *Materials which are not solid wastes.* The following materials are not solid wastes for the purpose of this part: [¶] (1)(i) Domestic sewage; and [¶] (ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. 'Domestic sewage' means untreated sanitary wastes that pass through a sewer system. [¶] (2) Industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act, as amended. [¶] (3) Irrigation return flows. [¶] (4) Source, special nuclear or by-product material as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 *et seq.* [¶] (5) Materials subjected to in-situ mining techniques which are not removed from the ground as part of the extraction process. [¶] (6) Pulping liquors (i.e., black liquor) that are reclaimed in a pulping liquor recovery furnace and then reused in the pulping process, unless it is accumulated speculatively as defined in § 261.1(c) of this chapter. [¶] (7) Spent sulfuric acid used to produce virgin sulfuric acid, unless it is accumulated speculatively as defined in § 261.1(c) of this chapter. [¶] (8) Secondary materials that are reclaimed and returned to the original process or processes in which they were generated where they are reused in the production process provided: . . . [¶] (9)(i) Spent wood preserving solutions that have been reclaimed and are reused for their original intended purpose; and [¶] (ii) Wastewaters from the wood preserving process that have been reclaimed and are reused to treat wood. [¶] (10) EPA Hazardous Waste No. K087, and any wastes from the coke by-products processes that are hazardous only because they exhibit the Toxicity Characteristic specified in Section 261.24 of this part, when, subsequent to generation, these materials are recycled to coke ovens, to the tar recovery process as a feedstock to produce coal tar or are mixed with coal tar prior to the tar's sale or refining. This exclusion is conditioned on there being no land disposal of the wastes from the point they are generated to the point they are recycled to coke ovens or the tar refining process. [¶] (11) Nonwastewater splash condenser dross residue from the treatment of K061 in high temperature metals recovery units, provided

current title 22, section 66261.4. That document states that "40 CFR section 261.4(a)(1)(i) and (a)(1)(ii) [the domestic sewage exemption] are not being incorporated because State law has no exclusion for either domestic sewage or for mixtures of domestic sewage and other wastes." (Cal. Dept. of Health Services, Environmental Health Standards for the Management of Hazardous Waste—Final Statement of Reasons (1991) p. Ch11-8.)[12]

Despite this exceedingly clear statement of administrative intent, defendants cite current title 22, section 66261.4, subdivision (b)(2) which states that hazardous wastes do not include "materials which are exempted or excluded from classification as solid waste or hazardous waste pursuant to 40 CFR section 261.4 *if* they do not exhibit a characteristic of a hazardous waste as set forth in article 3 of this chapter." (Italics supplied.) Defendants contend that this subdivision incorporates the domestic sewage exemption because it incorporates all of the exemptions in 40 Code of Federal Regulations, section 261.4. There are two serious flaws in this argument. First, current title 22, section 66261.4 was not adopted until 1991, long after defendants committed the crimes that are the subject of this appeal. (Cal. Reg. Notice Register 91, No. 23-Z, p. 760.) Defendants have not cited any statutes or regulations which were in effect at the time the crimes were committed (1989) which purport to incorporate the domestic sewage exemption. Consequently, we must conclude that in 1989 "State law ha[d] no exclusion for either domestic sewage or for mixtures of domestic sewage and other wastes." (Cal. Dept. of Health Services, Environmental Health Standards for the Management of Hazardous Waste—Final Statement of Reasons, *supra*, at p. Ch11-8.)

Furthermore, even the current version of title 22, section 66261.4 does not make a categorical exemption for domestic sewage or wastes mixed with domestic sewage. At best, subdivision (b)(2) of that section would exempt industrial wastes mixed with domestic sewage only if the wastes "do not exhibit a characteristic of a hazardous waste" as defined in the regulations.[13] These characteristics are "ignitability," "corrosivity," "reactivity," and "toxicity." (Current tit. 22, §§ 66261.21 through 66261.24.) A waste exhibits the characteristic of "corrosivity" if it is aqueous and has a pH of less than or equal to 2. (Current tit. 22, § 66261.22, subd. (a)(1).) Here, the liquid found in the trench had a pH of less than 2 and thus exhibited the characteristic of

it is shipped in drums (if shipped) and not land disposed before recovery." (40 C.F.R. § 261.4.)

[12]We take judicial notice of this document pursuant to Evidence Code sections 452, subdivision (c), and 459, subdivision (a).

[13]Since we have concluded that the relevant subdivision was not in effect at the time defendants committed their crimes, we merely assume, but do not decide, that current title 22, section 66261.4, subdivision (b) partially incorporates the domestic sewage exemption.

corrosivity. Consequently, it would not be exempted even under the current regulation.[14]

In sum, at the time defendants committed their crimes (1989) California had not adopted the RCRA's domestic sewage exemption in any form. Moreover, even the current regulatory scheme would classify the dumped liquid as a hazardous waste because it exhibited the characteristic of corrosivity.

B. *The East Bay Municipal Utility District Sewage Treatment Plant Is Not a "Permitted" Facility for the Purpose of Section 25189.5.*

Defendants next contend that they did not violate section 25189.5 of the Hazardous Waste Act by discharging hazardous wastes into the sewer system because that system led to a permitted facility: namely, the East Bay Municipal Utility District (EBMUD) sewage treatment plant. We reject this argument.

Subdivisions (a) and (b) of section 25189.5 prohibit a person from knowingly disposing hazardous waste "at a facility *which does not have a permit* from the [Department of Toxic Substances Control] issued pursuant to this chapter, or at any point which is not authorized according to this chapter . . . ." (Italics added.) Defendants contend that the EBMUD sewage treatment plant had a permit by operation of law and, therefore, any discharge of hazardous waste into the sewer system which led to that plant did not violate section 25189.5.

At the time of the sewer dumping in this case, the regulations implementing the Hazardous Waste Act explicitly stated that permits were required for "[t]reatment, storage or disposal of hazardous waste at facilities requiring an NPDES[15] permit. However, the owner and operator of a publicly owned treatment works (POTWs) receiving hazardous waste will be deemed to have a permit for that waste if they comply with the requirements of Section 66392 (permit by rule for POTWs)." (Tit. 22, § 66371, subd. (b)(2).)

---

[14]Current title 22, section 66261.4, subdivision (b)(2) is confusing to the uninitiated reader. It seems to say that a waste exempted under 40 Code of Federal Regulations, section 261.4 is not a hazardous waste only if it is first determined that the waste is not hazardous under California law. However, the exclusion makes more sense when read in conjunction with section 66261.3, which broadly defines a waste as hazardous if it meets one of *several* tests, even if the waste does not exhibit a hazardous "characteristic" as defined in the regulations. Thus, a waste which does not exhibit a hazardous "characteristic," but is otherwise considered hazardous under section 66261.3, may nevertheless be exempted if it falls into one of the exemptions in 40 Code of Federal Regulations, section 261.4.

[15]See discussion, *ante*, at pages 1129-1130.

Title 22, section 66392[16] provided in pertinent part: "Notwithstanding any other provision of this chapter, the following shall be deemed to have a permit *if* the conditions listed are met: [¶] (a) Publicly owned treatment works. The owner or operator of a POTW which *accepts* for treatment hazardous waste, if the owner or operator: [¶] (1) Has an NPDES permit and has received waste discharge requirements issued by a Regional Water Quality Control Board; [¶] (2) Complies with the conditions of the permit or discharge requirements; and [¶] (3) Complies with the following regulations: (A) Section 67100, Identification Number; [¶] (B) Section 67161, Use of Manifest System; [¶] (C) Section 67162, Manifest Discrepancies; [¶] (D) Section 67163 (a) and (b)(1), Operating Record; [¶] (E) Section 67165, Annual Report; [¶] (F) Section 67166, Unmanifested Waste Report; *and* [¶] (4) *If the waste meets all federal, state and local pretreatment requirements which would be applicable to the waste if it were being discharged into the POTW through a sewer, pipe or similar conveyance.*" (Tit. 22, § 66392, italics added.)

The problem with defendants' argument—as the People point out—is that the EBMUD treatment works have not met the necessary requirements to be deemed a permitted facility. To the contrary, an EBMUD representative testified at trial that EBMUD does not accept hazardous waste for treatment because it would be incompatible with the biological treatment system EBMUD employs. Moreover, because EBMUD does not accept hazardous waste for treatment, it does not have a manifest system, as required by title 22, section 66392, subdivision (a)(3)(A) through (a)(3)(F).

Defendants counter that "the confusion" regarding title 22, section 66392 arises from the fact that most POTW's accept hazardous wastes in two ways: first, as part of the effluent received through the sewer network; and second, in bulk shipments, usually by truck, from refineries, hazardous waste treatment units, and other sources. According to defendants, only the conditions in subdivisions (1) and (2) of title 22, section 66392, subdivision (a) must be met in order for a POTW to be considered a permitted facility for the purpose of receiving hazardous waste *through the sewer system.* The conditions in subdivisions (3) and (4) must be met (according to defendants) only if the POTW is receiving hazardous waste by bulk shipments.

The problem with this argument—other than its conflict with the plain language of the regulation (see *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299])—is that it ignores the fact California has *not* adopted a domestic sewage exemption. (See *ante*, pp. 1131-1133.) It

---

[16]The substance of title 22, section 66392, subdivision (a) is now found at current title 22, section 66270.60, subdivision (d)(1).

would be inconsistent to find that California has *not* adopted the domestic sewage exemption, while at the same time concluding that all POTW's are nevertheless permitted facilities for the purpose of accepting hazardous wastes through the sewers. "[S]tatutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) In light of this rule of construction, a far more reasonable interpretation of title 22, section 66392, subdivision (a) is that it applies to *bulk shipments only*, not to wastes received through the sewers. The wording of the regulation is consistent with this interpretation. First, the regulation only applies to POTW's which "accept" hazardous wastes for treatment. The word "accept" implies a volitional act, which would not apply to wastes received through the sewers. Second, most of the conditions—all of which are clearly stated in the conjunctive—could only apply to bulk shipments of waste. Finally, subdivision (a)(4) also implies that all of subdivision (a) applies only to bulk shipments. It states that the POTW will be deemed to have a permit only "[i]f the waste meets all federal, state and local pretreatment requirements which would be applicable to the waste *if it were being discharged into the POTW through a sewer*, pipe, or similar conveyance." (Italics supplied.) The implication is that the wastes under consideration are those which are *not* discharged through "a sewer, pipe, or similar conveyance."

We concede that the interpretation we have placed on title 22, section 66392, subdivision (a) is not easily ascertained from the plain language of the regulation. However, our interpretation is far more reasonable than the interpretation defendants would have us adopt. (*Lungren* v. *Deukmejian, supra*, 45 Cal.3d at p. 735.) Nevertheless, we believe the Department of Toxic Substances Control (§ 25111) would be well advised to review its current regulation on this point (current tit. 22, § 66270.60, subd. (d))[17] and to make such amendments as are necessary to clarify its intent.

In sum, we conclude that the EBMUD sewage treatment plant is not a "permitted facility" for the purpose of receiving hazardous wastes through the sewer system.

### C. *Spilled Product.*

Under a separate argument heading in their brief, defendants note that "spilled product" is not "waste," and thus is not subject to regulation under the Hazardous Waste Act. However, defendants make no attempt to connect

---

[17]Current title 22, section 66270.60, subdivision (d) is in practical effect identical to former section 66392, subdivision (a).

their legal analysis with any of the evidence in this case. In other words, defendants do *not* argue that there is insufficient evidence to support a finding that the materials involved are "waste" (as opposed to spilled product) within the meaning of the relevant law. (See current tit. 22, § 66261.2.) If defendants believe they have made such an argument, it is summarily rejected. (See *Sprague* v. *Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050 [213 Cal.Rptr. 69].)

## II

█ Defendants next contend that all of the convictions must be reversed because the laboratory which performed the chemical analyses in this case was not certified by the Department of Toxic Substances Control. We reject this argument.

Section 25198, subdivision (a) of the Hazardous Waste Act provides that "[t]he analysis of any material required by this chapter shall be performed by a laboratory certified by the department . . . ." Subdivision (b) of section 25198 prohibits a person or public entity from contracting with an uncertified laboratory "for environmental analyses for which the department requires certification pursuant to this chapter . . . ." The People concede that the lab which performed the relevant analyses in this case was not certified under the Hazardous Waste Act. Nevertheless, they successfully argued below that the certification requirement does not apply to criminal prosecutions, where the tests are performed on behalf of law enforcement officials.

The People contend that the certification requirement is not applicable to law enforcement agencies because such agencies are not "required by this chapter" to take and analyze samples. (§ 25198, subd. (a).) Instead, that requirement only applies to *generators* of hazardous waste who are required to characterize their *own* waste in order to determine if it meets regulatory standards. As the People put it, the purpose of the certification requirement is to force "those who must characterize their own waste to submit lab results in which the regulator can have confidence."[18]

Although the People's argument may have merit, we need not decide that issue in this case because we conclude the evidence would have been admissible even if certification were required. Failure to follow precise regulatory or statutory requirements for laboratory tests generally does not

---

[18]Or as the trial court put it more colorfully, the purpose for having certified laboratory requirements is to "prevent people with their little home pH kit from doing their own analysis and declaring that that which they are generating does or does not fall within the relevant statutory framework."

render the test results inadmissible, but instead goes to the weight accorded to the evidence. In *People* v. *Adams* (1976) 59 Cal.App.3d 559 [131 Cal.Rptr. 190], the court held that a failure to comply with regulatory calibration procedures for breath-alcohol testing equipment did not render the test results inadmissible, provided the foundational requirements for establishing the reliability of the tests are met. (*Id.*, at pp. 561-563, 567.) The necessary foundational requirements are: (1) the testing apparatus is in proper working order; (2) the test was properly administered; and (3) the operator was competent and qualified. (*Id.*, at p. 561; *Davenport* v. *Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 140 [7 Cal.Rptr.2d 818].) Defendants essentially concede that these foundational requirements were met in this case.[19] Indeed, defendants' own expert testified that he held the work of the prosecution's lab in high regard.

Nevertheless, defendants attempt to distinguish *Adams* on the ground that *Adams* involved a regulation while the present case involves a statutory requirement. They cite Evidence Code section 351, which provides that "[e]xcept as otherwise provided by *statute*, all relevant evidence is admissible." (Italics added.) However, *Adams* relied on *People* v. *Rawlings* (1974) 42 Cal.App.3d 952, 956 [117 Cal.Rptr. 651], which states: "Where a *statute* . . . does not specifically provide that evidence shall be excluded for failure to comply with *said statute* and there are no constitutional issues involved . . . such evidence is not inadmissible. *Statutory* compliance or noncompliance merely goes to the weight of the evidence." (Italics added; *People* v. *Adams*, *supra*, 59 Cal.App.3d at pp. 566-567.)

Here, the relevant statutes do not specifically provide that evidence shall be excluded for failure to use a certified laboratory. Nor do defendants raise constitutional issues to bar admission of the test results. Consequently, the lack of laboratory certification merely goes to the weight of the evidence, and had no material effect on the trial.[20]

### III

■ Defendant Sangani next contends the trial court applied an improper legal standard (something less than actual knowledge or negligence) to hold him *personally* liable for the dumping (§ 25189.5) and reckless storage (§ 25189.6) felonies. The claim is meritless.

[19]Although defendants contend some of the procedures employed by the prosecution lab differed from those required by the regulations, they do not contend that the test results were thereby rendered unreliable.

[20]Defendants had ample opportunity to challenge the prosecution's test results on cross-examination. Moreover, they retested the material using their own laboratory which basically confirmed the prosecution's test results.

Sangani was tried by the court, not by a jury. We must presume that the trial court knew and applied the correct law in the exercise of its official duties. (*People* v. *Lewis* (1987) 191 Cal.App.3d 1288, 1296 [237 Cal.Rptr. 64]; *People* v. *Castellano* (1983) 140 Cal.App.3d 608, 612 [189 Cal.Rptr. 692]; Evid. Code, § 664.) The only "evidence" Sangani cites to overcome this presumption is argument by the People. However, the fact that *the People* may have cited an improper standard does not overcome the presumption that the court acted properly. This is especially true here where the defendants cited the correct standard in their written closing argument (*U.S.* v. *MacDonald & Watson Waste Oil Co.* (1st Cir. 1991) 933 F.2d 35, 55), and the People themselves primarily relied on the standard suggested by the defense.[21] Sangani has not pointed to a single statement *by the court* which indicates that it applied an improper standard on this issue. Instead, he states (without citation to the record) that the court "apparently accepted" the prosecution's statement of the law. This is insufficient to overcome the presumption that the court applied the correct law.

■ Sangani also contends there is insufficient evidence to hold him personally liable on the felony counts if the proper standard is applied. He is wrong.

With respect to the sewer dumping in violation of section 25189.5, subdivisions (a) and (b), the trial court was required to find that Sangani knowingly caused, or reasonably should have known that he caused, the disposal of hazardous waste at an unpermitted facility. (*People* v. *Martin*, *supra*, 211 Cal.App.3d at pp. 710-711.) Section 25189.5 includes knowledge or negligence as an element of the crime, and therefore is not a strict liability offense. (*Martin*, *supra*, at p. 713; *People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1058 [9 Cal.Rptr.2d 348].) Sangani contends there is insufficient evidence of knowledge or negligence because he was out of town at the time the offense occurred. He is wrong. Viewing the evidence in the light most favorable to the prosecution (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the record shows that two of Sangani's employees testified that Sangani *alone* made all decisions about management of waste and its removal from the premises. In fact, there were no foremen or supervisors at the plating shop. Additionally, Sangani was well aware of the waste disposal requirements of his business and had made prior attempts to circumvent them. He had illegally diluted his

---

[21]In their written final argument, the People stated that "the necessary showing of an accused's state of mind for liability under Health and Safety § 25289.5 [*sic*] is that of simple negligence. *People* v. *Martin* (1989) 211 Cal.App.3d 699 [259 Cal.Rptr. 770, 86 A.L.R.4th 383]. It has never been suggested by the prosecution that Mr. SANGANI actually did the dumping himself. In all likelihood it was an employee, acting at the defendant's direction." This is consistent with Mr. Sangani's legal position on this issue.

waste stream and had lied about plugging the very sewer lateral through which the wastes were disposed in this case. The circumstantial evidence supports a finding that Sangani not only acted negligently, but that he knowingly directed his employees to dispose of the wastes through the clandestine sewer lateral.

With respect to the violation of section 25189.6, subdivision (a) (reckless storage of wastes in the tank outside the building), the evidence of knowledge and recklessness is even stronger.[22] One of Sangani's employees stated that Sangani told him to take the tank outside the week before Sangani left town. Moreover, Mr. Sangani's daughter testified that he specifically told her to look after the tank to make sure that no trash would be put into it, thereby suggesting that Mr. Sangani knew the tank contained dangerous material.

In sum, we presume that the trial court applied the proper legal standard in this case, and find the evidence sufficient to support Sangani's convictions under that standard.

## IV

Defendants next contend we must reverse their convictions under section 25189.6, subdivision (a) (recklessly storing hazardous waste in the tank on the sidewalk) because the cyanide mixture in the tank was not "waste"[23] as a matter of law. We disagree.

At the time the offense was committed (1989), section 25124, subdivision (a) defined "waste" in the following manner: " 'Waste' " means any discarded material that is not excluded by this chapter or by regulations adopted pursuant to this chapter."[24] A material is "discarded" if it is "accumulated, stored, or treated" before being disposed of or recycled. (§ 25124, subds. (c)(3), (d).) Defendants essentially concede that the material in the tank was "waste" under this definition, and that it was not excluded by the California regulations in effect in 1989. (See tit. 22, § 66300.)

Nevertheless, they cite a new California regulation—adopted in 1991—which states in pertinent part: "(c) hazardous wastes which are exempted

---

[22]Section 25189.6, subdivision (a), requires that the person act "knowingly, or with reckless disregard for the risk."

[23]Section 25189.6, subdivision (a) makes it a crime to recklessly store hazardous *waste.* Consequently, the prosecution was required to establish that the material in the tank was waste, not product.

[24]In 1992, this sentence was amended to read: " 'Waste' means any solid, liquid, semisolid, or contained gaseous discarded material that is not excluded by this chapter or by regulations adopted pursuant to this chapter." (Stats. 1992, ch. 1344, § 3.)

from *certain regulations*. A hazardous waste which is generated . . . in a manufacturing process unit . . . is not subject to *regulation under this division* . . . until it exits the unit in which it was generated . . . or unless the hazardous waste remains in the unit more than 90 days after the unit ceases to be operated for manufacturing . . . ." (Current tit. 22, § 66261.4, subd. (c), italics added; Cal. Reg. Notice Register 91, No. 23-Z, p. 760; see also 40 C.F.R. § 261.4(c).)

Even if we assume that this exemption *from regulation* could be applied in 1989, it would not prevent defendants from being prosecuted under section 25189.6. Importantly, the regulation does not exclude materials generated in a manufacturing process unit from the definition of "waste" or "hazardous waste." (Cf. current tit. 22, § 66261.4, subd. (a) ["Materials which are not wastes."] & § 66261.4, subd. (b) ["Wastes which are not hazardous wastes."]) Instead, the regulation acknowledges that such materials are "hazardous wastes" but excludes them "from regulation *under this division*" until they are removed from the manufacturing unit; that is, wastes held in manufacturing process units are not subject to regulation under division 4.5 of title 22 of the California Code of Regulations. However, the regulation does not exempt defendants from *prosecution* under section 25189.6 of the Health and Safety Code, which applies to "[a]ny person who knowingly, or with reckless disregard for the risk, . . . handles . . . or stores *any* hazardous waste in a manner which causes any unreasonable risk of fire, explosion, serious injury, or death . . . ." (Italics added.) This section transcends the regulations by making it a felony for a person to handle "any hazardous waste" in a manner which causes an unreasonable risk of death or injury. Regulation under division 4.5 of title 22 of the California Code of Regulations is simply not an element of the criminal charge. Even under the new regulation cited by defendants, the material in the tank was still "hazardous waste" as defined in section 25189.6, subdivision (a).

V

Defendants next contend there was insufficient evidence to support the misdemeanor convictions for storing hazardous waste on site for more than 90 days (§ 25190; tit. 22, § 66508, subd. (a)), accumulating hazardous wastes without properly labeling the storage drums (§ 25190; tit. 22, § 66508, subd. (a)), and storing hazardous wastes without a secondary containment system (§ 25190; tit. 22, § 67245). We conclude that all misdemeanor convictions are supported by substantial evidence.

██ When a trial court's finding of guilt is challenged as being unsupported by the evidence, the reviewing court must examine the entire record

to determine if a rational trier of fact could have found that the defendant committed the charged offenses beyond a reasonable doubt. (*People* v. *Johnson*, *supra*, 26 Cal.3d at pp. 576-577.) In making this determination, the appellate court " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Id.*, at p. 576, citations omitted.)

The first misdemeanor conviction is based on title 22, section 66508, which provides that "[a] generator may accumulate hazardous waste on site for 90 days or less without a permit . . . ." (See § 25190, which makes violation of the regulations a misdemeanor.) ■ Defendants claim there is no evidence waste was accumulated on site for more than 90 days. They are wrong. Leedy Plating plated metal by dipping it into various tanks in sequence. The plating residue would drip off the metals and collect in floor sumps at the facility. These sumps contained liquid which was economically worthless, incapable of being recycled, and hazardous under regulatory criteria. At the time of the offenses, state law required that all waste generators prepare a waste manifest for all shipments of hazardous waste from a generating facility such as Leedy Plating to a disposal or treatment site. (Tit. 22, §§ 66480-66484.) Hazardous waste generators were required to file a copy of the manifest with the Department of Toxic Control. (Tit. 22, § 66484, subd. (f).) However, Leedy Plating did not file a waste manifest for more than one year before the premises were searched in July of 1989. Thus, no wastes were removed from the premises—at least legally—for more than a year preceding the search. Moreover, Mr. Sangani actually admitted to one of the county officials that he had stored hazardous waste at his facility for more than 90 days. Viewing the evidence in the light most favorable to the People, it is reasonable to presume from this evidence that Leedy Plating in fact accumulated hazardous waste on site for more than 90 days.[25]

■ Next, defendants claim there is insufficient evidence to support their conviction for failing to mark the beginning accumulation date on each container of hazardous waste as is required by title 22, section 66508, subdivision (a)(2). They are wrong. A county official inspected the premises and found at least eight drums marked with "hazardous waste" stickers that did not have an accumulation start date. Defendants claim the prosecution had to introduce chemical tests to establish that the drums actually contained

---

[25]Defendants also cite title 22, section 67245, subdivision (b)(5) which provides that "[s]pilled or leaked waste and accumulated precipitation shall be removed from the sump or collection area in as timely a manner as is necessary to prevent overflow of the collection system." They claim that this requirement preempts the 90-day holding period. However, the quoted section applies to sumps which are part of "container storage areas," and has no application to the sump in this case. (See tit. 22, § 67245, subd. (a).)

hazardous waste in order to prove a violation of the regulation. However, the "hazardous waste" stickers were themselves evidence that the drums contained hazardous waste. (See *In re Michael G.* (1993) 19 Cal.App.4th 1674 [24 Cal.Rptr.2d 260] [manufacturer's label indicating that product contained toluene is evidence that product in fact contained that substance].) Although the stickers were hearsay, defendants never made a hearsay objection to their content, and we may therefore consider that evidence to support the judgment. (3 Witkin, Cal. Evidence (3d ed. 1986) §§ 2033-2034, pp. 1994-1995; *Mosesian* v. *Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 865 [236 Cal.Rptr. 778].) Furthermore, although we need not decide the issue in this case, the stickers may have been *admissible* hearsay because they were inherently trustworthy. As the *Michael G.* court observed, "[a] label *including* (rather than excluding) a hazardous substance is inherently trustworthy, in that a manufacturer would have no interest in proclaiming that the product contained such a substance if in fact it did not." (19 Cal.App.4th at p. 1678, italics in original.) Similarly, a generator of hazardous waste would have no interest in labeling a drum "HAZARDOUS WASTE" unless the drum in fact included such a substance.

■ Finally, defendants claim the evidence does not support their conviction for failing to provide a secondary containment system, as required by title 22, section 67245, subdivisions (a) and (b). Again, they are wrong. Title 22, section 67245 provides in pertinent part: "(a) Container storage areas shall have a containment system that is designed and operated in accordance with subsection (b) of this section. [¶] . . . [¶] [(b)](3) The containment system shall have sufficient capacity to contain precipitation from at least a 24-hour, 25-year storm plus 10 percent of the aggregate volume of all containers or the volume of the largest container, whichever is greater. Containers that do not contain free liquids need not be considered in this determination." A prosecution witness who inspected the facilities stated that only *one* area in the shop was designated as a "hazardous waste storage area." According to the witness, that area had a "vessel" built into the floor and a concrete berm built around it, and presumably met the title 22, section 67245 containment requirements. However, the same witness testified that containers marked "hazardous waste"[26] were found in other rooms and areas of the facility, which did not have secondary containment. These areas were de facto "container storage areas" subject to the regulation. Because those containers were not protected by secondary containment, defendants violated the relevant regulation.

In sum, the misdemeanor convictions are supported by substantial evidence.

---

[26]Again, because there was no objection to this hearsay evidence, it was enough to support a finding that the drums in fact contained hazardous waste. (See discussion, *ante*, this page.)

## VI

Finally, defendants make a broad-based constitutional attack on all of their convictions, arguing that "[t]he statutes as construed violate due process because they fail to give adequate notice of the conduct required to avoid their penalties."[27] We disagree.

The relevant law has been laid out in *People* v. *Martin, supra*, where the court rebuffed a similar attack: " ' "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391.)' (*Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].) Due process 'requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt. [Citations.]'. . ." (*Martin, supra*, 211 Cal.App.3d at p. 705, final citation omitted.)

However, "[i]f an accused can reasonably understand by the terms of the statute that *his* conduct is prohibited, the statute is not vague [citation]. In determining the sufficiency of the notice, a statute *must of necessity be examined in the light of the conduct with which the defendant is charged* [citation]. Furthermore, in the field of 'regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed' than in statutes applicable to the general public . . . ." (*People* v. *Anderson* (1972) 29 Cal.App.3d 551, 561 [105 Cal.Rptr. 664], italics added; quoted in *People* v. *Martin, supra*, 211 Cal.App.3d at pp. 705-706.) Finally, a regulated business "can be expected to consult relevant legislation in advance of action . . . [and] may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." (*Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 498 [71 L.Ed.2d 362, 371-372, 102 S.Ct. 1186], fns. omitted; quoted in *People* v. *Martin, supra*, 211 Cal.App.3d at p. 706.)

Defendants' vagueness challenge to their felony convictions is frivolous in light of the rule that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." (*Parker* v. *Levy* (1973) 417 U.S. 733, 756 [41 L.Ed.2d 439, 458, 94 S.Ct. 2547]; quoted in *Cranston* v. *City of Richmond, supra*, 40 Cal.3d at p. 764.) It does not take a

---

[27]Although defendants allude to other constitutional principles in their argument, we construe the argument as a basic "void for vagueness" argument.

rocket scientist to understand that surreptitiously dumping liquid hazardous waste down a sewer lateral—a sewer lateral which the authorities had specifically ordered sealed because of concerns about illegal dumping—violates section 25189.5's injunction against illegally disposing of hazardous waste at a nonpermitted facility. Nor does it require a degree in chemical engineering (which, incidentally, Sangani had) to understand that leaving an open tank containing a deadly cyanide mixture on a public sidewalk constitutes handling hazardous waste in a manner that creates an unreasonable risk of serious injury or death (§ 25189.6, subd. (a)). These were not marginal crimes. One constituted a conscious, calculated attempt to dispose of hazardous waste in order to avoid the burdens of regulation, while the other involved an utter disregard for the safety of the public.

With respect to the misdemeanors, although they were more technical in nature, the relevant regulations clearly informed the defendants of the proscribed or required conduct. To the extent there were minor ambiguities, Sangani, who ran a regulated business, could be "expected to consult relevant legislation in advance of action . . . [and] . . . to clarify the meaning of the regulation by [his] own inquiry, or by resort to an administrative process." (*Hoffman Estates* v. *Flipside, Hoffman Estates, supra,* 455 U.S. at p. 498 [71 L.Ed.2d at pp. 371-372], fns. omitted; quoted in *People* v. *Martin, supra,* 211 Cal.App.3d at p. 706.)

The relevant statutes and regulations were not unconstitutionally vague as applied to defendants' conduct.

The judgment is affirmed.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied March 16, 1994.