Filed 10/21/15  P. v. Soto CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050353 |
| v. | (Super. Ct. No. 11CF2411) |
| WILLY SOTO, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, M. Marc Kelly, Judge.  Affirmed as modified.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　\*　　　\*

Defendant Willy Soto, Jr., was charged with attempting to murder Joseph Gonzales (Pen. Code,[1] §§ 664, subd. (a), 187, subd. (a); count one) and assaulting Lillian Martin with a deadly weapon (§ 245, subd. (a)(1); count two), arising out of an incident on September 3, 2011.[2] The amended information alleged the attempted murder was deliberate and premeditated (§ 664, subd. (a)), defendant used a deadly weapon in the commission of the attempted murder (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)) in both counts. The jury found defendant guilty of attempted voluntary manslaughter (§§ 664, subd. (a), 192, subd. (a)) as a lesser included offense of the attempted murder, guilty of the aggravated assault on Martin, found defendant used a deadly weapon and personally inflicted great bodily injury in the commission of the attempted manslaughter, and found defendant did not personally inflict great bodily injury on Martin. The trial court denied defendant's motion for a new trial, and sentenced him to one year and six months on the attempted manslaughter, and a consecutive term of three years on the great bodily injury enhancement, for a total state prison sentence of four years and six months. The weapon use enhancement was stricken for sentencing purposes and the court imposed a two-year concurrent term on the assault charge.

Defendant appeals, contending the court prejudicially erred in admitting evidence of his statements at the scene in violation of *Miranda*,[3] in admitting photographs of Gonzales's injuries, in instructing the jury, in failing to answer the jury's question, in denying his motion for a new trial, and in imposing a $240 restitution fine. We find the amount of the restitution fine was imposed in violation of the ex post facto

---

[1] All undesignated statutory references are to the Penal Code.

[2] Defendant had been charged with an additional count of assault with a deadly weapon against Gonzales, but the prosecution dismissed that count prior to trial.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

clauses of the federal and state constitutional provisions, and will order the abstract of judgment amended to reflect the imposition of a $200 restitution fine, but otherwise affirm the judgment.

I

FACTS

On September 2, 2011, Alina Sanchez, Joseph Gonzales, his girlfriend Lillian Martin, and Alex Sisneros drove to defendant's residence to pick up defendant and his girlfriend Monique Soto to go to a bar in Newport Beach. While at defendant's residence, defendant showed the three other men a knife he was carrying. He said he would use it if anything were to happen that night. With the exception of Sisneros, everybody was drinking in Sisneros's sport utility vehicle (SUV) on the way to the bar. Defendant rejected Sisneros's suggestion to put the knife in the SUV's glove compartment.

The group met their friends David and Stephanie Moreno at the bar. The Morenos arrived first and got the table reserved for the group. When the group arrived, the table was already full with appetizers. During the night, the group, including the Morenos, talked, drank, and danced. Everyone appeared to be having a good time.

At one point during the evening, the group was in a circle, talking. Defendant was standing next to Martin. He reached underneath Martin's skirt and grabbed her buttocks. Martin moved away from defendant and stood next to Gonzales.

Later that evening while Martin was dancing with Gonzales, defendant "did it again" and said something to the effect of "Why don't you turn around and I'll grab the front." Martin felt uncomfortable, so she left the dance floor and sat down in their booth. Gonzales did not see what defendant did, but he noticed Martin appeared to be uncomfortable and "bounc[ed] around" a lot, i.e., not staying in one place for any length of time.

3

Sanchez was the designated driver. She drove when the group left the bar that evening. Sisneros was in the front passenger seat. In the middle seat were Paul Mayor, Monique Soto and defendant. Defendant was on the right, behind Sisneros. In the backseat were Martin and Gonzales. According to Martin, the others had been drinking and were intoxicated. She agreed defendant was "really drunk."

While they were all in the SUV, Gonzales noticed Martin was quiet and acting differently. He repeatedly asked her why she was acting that way. She said she was fine, and he said he knew something was wrong. Eventually he asked Martin, "[H]e touched you, didn't he?" Gonzales then shoved defendant on the shoulder and accused him of touching Martin. Defendant ignored Gonzales. Gonzales then hit defendant on his shoulder or the back of his head, then punched defendant in the back of his head, and told Sanchez to stop the car.

Defendant turned around. Kneeling on his seat and facing Gonzales, defendant reached into his pocket, pulled his hand out of the pocket and began swinging his arms at Gonzales and Martin. Gonzales said they would talk about the matter later, but defendant said they would deal with it now, and kept fighting. Sanchez pulled over to the side of the freeway, stopped, and called 911. When the interior light went on, Mayor and Sanchez saw blood soaking through the front of Gonzales's shirt. Gonzales had trouble breathing, foamed at the mouth, and went in and out of consciousness.

Defendant got out of the vehicle, ran to the sound wall at the side of the freeway, and leaned against it. Monique Soto screamed, asking defendant what he had done. Defendant denied having done anything.

It was not until paramedics arrived that Martin realized she had been stabbed as well. Officer Michael Andrews of the Orange Police Department responded to the scene. When he asked who had stabbed them, Martin and Gonzales pointed to defendant. Andrews walked over to defendant and asked him what happened. Defendant said he heard Gonzales and Martin arguing behind him in the car and he got hit in the

4

head. Andrews noticed some swelling to the left side of the back of defendant's head. Defendant said the next thing he remembered was standing on the side of the freeway. Andrews asked defendant why he had blood on his hands and defendant denied knowing how the blood got there. Andrews saw a knife on the top of the sound wall, about 10 feet from defendant. He asked defendant if the knife was his. Defendant answered, "Possibly." Defendant denied stabbing Gonzales and said there had been a car accident.

At the police station, defendant was interrogated by Detective McMullin and Sergeant Scott Trausch. Trausch said defendant did not appear intoxicated, confused, or disoriented. Although defendant initially said he did not remember what happened and that he may have lost consciousness, that his nose hurt and everything was vague, he later said he remembered a disturbance between Gonzales and Martin about someone making a pass at her. Defendant said Gonzales may have been angry at him for not defending Martin. Defendant stated he was hit with fists, a can, or a bottle and feared for his life. For that reason he pulled his knife. He said he begged Gonzales to stop. Defendant claimed he remembered swinging the knife behind his head, not knowing what he hit, if anything. He said he told Sanchez to stop the car and remembered throwing the knife and running from the vehicle.

Gonzales was critically impaired when he arrived at the hospital. He had a 33-centimeter deep laceration across his chest and both his lungs had been punctured. Without surgery to relieve pressure inside his chest, he would have died. Gonzales was placed on a respirator for two days and remained in the hospital for six days.

*Defense*

Defendant testified. He denied having any conversation with Gonzales, Sisneros, or Mayor, or showing the knife to Mayor that night. He said it was not until they got to the bar that night that he realized the knife was in his pocket. He said he put the knife on the floor of the SUV. He denied grabbing or touching Martin at the bar.

5

When they returned to the SUV to go home, Monique Soto gave defendant his knife. He put it in his pocket. Defendant began to fall asleep on the drive home, but heard loud voices and a man's voice say "f… something" or "f… you." Then defendant was hit in the back of his head, snapping his head forward. He did not know who was hitting him, but he was getting hit hard and thought he was going to die. Once when hit, defendant saw a flash of light and blacked out for a moment. When he regained consciousness, he tried to lean forward in his seat, but his seatbelt restricted his movement. He put his arms up to defend himself, holding the unopened knife in one hand.

Defendant said he did not try to kill Gonzales. He remembered swinging his left hand to avoid being hit, and someone grabbing it. Defendant left the car, although he did not remember walking to the sound wall. He said that when he left the car, he did not know he had stabbed Gonzales and Martin.

Defendant presented the testimony of three character witnesses who testified he is not violent. He also presented the testimony of Dr. Scott Fraser, a psychologist and university professor. He testified to the human alarm reaction pattern and that it may be triggered by perceived danger. When flight from the perceived danger is not an option, there is an increased likelihood the person perceiving the danger will react violently. Given a hypothetical reflecting the facts of the case, Fraser said defendant's response was consistent with a fight or flight reaction.

II

DISCUSSION

A. *Defendant's Statements at the Side of the Freeway*

When Andrews responded to the scene, he saw defendant standing by the sound wall at the side of the freeway. Andrews spoke with the occupants of the vehicle first. He then contacted defendant, whom he viewed as a suspect, after he had been told defendant stabbed two of the occupants. Andrews asked defendant what happened.

6

Defendant said he had been struck by Gonzales from behind, and he yelled at Gonzales to stop. Andrews asked defendant if he stabbed Gonzales. Defendant said there had been a traffic accident and could not explain the blood on his hands. Andrews believed defendant was a possible suspect and in his mind, defendant was not free to leave. Andrews did not, however, handcuff defendant or draw his weapon. The officer did not advise defendant of his *Miranda* rights. Defendant argues a *Miranda* advisement was required and the court erred in admitting his statements over his objection. In a case such as this, where the defendant claims he was questioned without benefit of a *Miranda* warning, "[t]he prosecution has the burden of proving that a custodial interrogation did not take place." (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 953.)

Statements obtained from a suspect as the result of a "custodial interrogation" are not admissible in the prosecution's case-in-chief, absent a knowing and intelligent waiver of the right to remain silent, the right to presence of an attorney, and the right to appointed counsel in the case of an indigent suspect. (*People v. Sims* (1993) 5 Cal.4th 405, 440, citing *Miranda v. Arizona*, *supra*, 384 U.S. at pp. 444-445, 473-474; see *People v. Elizalde* (2015) 61 Cal.4th 523, 541 [case-in-chief].) Defendant argues his statements were obtained as a result of a custodial interrogation without benefit of an advisement and waiver.

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*Miranda v. Arizona*, *supra*, 384 U.S. at p. 444.) For purposes of *Miranda*, an individual is in custody when "'a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) The objective circumstances of the interrogation are examined, not the "'"subjective views harbored by either the interrogating officers or the person being questioned."'" [Citation.]" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.) In making this determination, "[t]he totality of the circumstances surrounding an incident must be considered as a

7

whole.  [Citations.]  Although no one factor is controlling, the following circumstances should be considered:  '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.'  [Citation.]  Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview.  [Citation.]"  (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404.)

In the present case, defendant was not arrested prior to being questioned. The length of the contact between defendant and Andrews does not point to finding defendant was in custody.  The SUV pulled over to the side of the freeway, 911 was called, and defendant got out of the vehicle and walked to the sound wall.  Andrews first contacted the occupants of the SUV.  He could see individuals with stab wounds.  He asked who stabbed them and they pointed to defendant.  He then contacted defendant within a minute of arriving on the scene.  Andrews thought defendant might or might not be a suspect.  The others told the officer defendant was involved, but Andrews "did not know what [defendant's] involvement was."

Andrews, who was in uniform, did not draw his firearm or point any weapon at defendant.  Andrews neither handcuffed defendant nor directed him to sit down.  (See *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 [placing restrictions on person's freedom of movement may cause reasonable person to believe he or she is not free to leave].)  Defendant appeared to be "shaken up," disoriented or confused, and may have been in shock.  Andrews noticed defendant had visible swelling on the left side of

8

the back of his head, and a cut under one eye.

Andrews asked defendant what happened. Defendant started to cry and said he was seated with his girlfriend Monique Soto in the SUV and asked her what the people behind them were arguing about, but then he started to get hit in the back of his head. He said he yelled, "stop" when he was getting hit, and the next thing he remembered, he was standing on the side of the freeway. Andrews asked defendant if he stabbed Gonzales, and defendant responded that they had been in a car accident, but he did not know where or when the accident occurred. Defendant was unable to explain the blood on his hands. A knife was found on the sound wall, close to defendant. Andrews asked defendant if it was his. Defendant said it probably was. During this interaction, Andrews stood a couple of feet away from defendant. Andrews spoke to defendant while paramedics treated the victims, and stopped when the paramedics wanted to check on defendant's status. His conversation with defendant lasted perhaps five minutes. Thus, the questioning was not lengthy.

Additionally, the location was not one that suggested defendant was in custody. The questions were asked by the sound wall next to the freeway, adjacent to the SUV that had pulled over to the side of the freeway. If defendant felt constrained to remain at the location, it was likely due to the fact that he was standing on the side of the freeway (see Veh. Code, § 21960 [notwithstanding prohibition of pedestrians using freeway, "the driver or passengers of a disabled vehicle stopped on a freeway or expressway may walk to the nearest exit, in either direction, on that side of the freeway or expressway upon which the vehicle is disabled"]), rather than because the officer was asking him questions.

Although a second officer eventually arrived on the scene, that officer did not approach Andrews and defendant while they were talking. A CSI officer approached them to take photographs, toward the end of their conversation. Accordingly, the presence of other officers in the general area adds nothing to our analysis.

9

An officer may conduct himself or herself during questioning in such a manner as to convey to the suspect in no uncertain terms that he or she is in custody and not free to leave. This especially so if the questioning is accusatory. (*People v. Bellomo* (1992) 10 Cal.App.4th 195,198-199.) The officer was the only witness to testify at the hearing on the admissibility of defendant's statements. There was no evidence the officer conducted himself in such a manner that a reasonable person would have felt he was in custody. It does not appear the officer dominated the conversation, manifested a belief in defendant's guilt, or used techniques to pressure the defendant. (See *People v. Aguilera, supra*, 51 Ca.App.4th at p. 1162.)

The evidence demonstrates defendant was not in custody and a reasonable person would not have felt he was in custody at the time Andrews asked defendant questions at the side of the freeway. Accordingly, we conclude the trial court did not err in admitting defendant's statements into evidence.

B. *Admission of Photographs Depicting Injuries*

Over defendant's objections, the court admitted into evidence photographs of the injuries to Gonzales and Martin. He argued the photographs were inflammatory, unduly prejudicial, cumulative, and their prejudice outweighed any relevance. The court held a hearing on the issue and subsequently sustained defendant's objections to a number of the photographs, but overruled them as to others. On appeal, defendant argues the court should have excluded all the photographs from evidence pursuant to Evidence Code section 352.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Our Supreme Court has "described 'prejudice' referred to in Evidence Code section 352 as characterizing

10

evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 134.) The trial court has broad discretion in determining whether to exclude evidence pursuant to Evidence Code section 352. (*People v. Williams* (1997) 16 Cal.4th 153, 213.) We review a trial court's order admitting evidence under Evidence Code section 352 for an abuse of discretion. To prevail on such an argument, the defendant must show "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

Generally, "photographs should be excluded where their principal effect would be to inflame the jurors against the defendant because of the horror of the crime; on the other hand, if they have a probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, they are admissible, and the resolution of this question is primarily for the trial court in the exercise of its discretion. [Citations.]" (*People v. Chavez* (1958) 50 Cal.2d 778, 792.) Defendant notes courts have on occasion found autopsy photographs "particularly horrible," citing *People v. Marsh* (1985) 175 Cal.App.3d 987, 997. Our Supreme Court has also observed that photographs of victims in murder cases are always disturbing. (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 134.) Of course, the knowledge that the person depicted met a premature end, usually as the result of violence, naturally makes the photographs disturbing. Still, "[g]ruesome or not, admission of relevant autopsy photographs is in the sound discretion of the trial court, even where they are only cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness. [Citation.]" (*People v. Marsh*, *supra*, 175 Cal.App.3d at p. 998.)

Although these photographs appear to have been taken in a hospital, they are not autopsy photographs of a dissected body. While the photographs are not pleasant to look at, they cannot be described as "particularly horrible." Defendant argues the

11

photographs should have been excluded because they were unnecessary given Dr. Devang Savani "adequately described" the injuries for the jury. The photographs were relevant. Thankfully for all involved, Gonzales did not die from the wound inflicted by defendant, but the nature of the wound was relevant to prove defendant's intent to kill. (*People v. Hines* (1997) 15 Cal.4th 997, 1018, 1046 [photographs relevant to prove defendant intended to kill].) The photographs showed the extent of the wound, a long uneven cut from above defendant's right nipple across his chest, ending on Gonzales's left side, past his left nipple. Additionally, the photograph of the wound to Martin's thigh before the wound was closed was relevant to prove defendant not only used a deadly weapon to cause the injury, but that the injury qualified as great bodily injury for purposes of the enhancement attached to the assault charge.

The fact that Dr. Savani "adequately described" the injuries, does not mean the photographs were cumulative. The prosecutor need not "use 'other "sanitized" method[s] of presenting its case.' [Citations.]" (*People v. Brasure* (2008) 42 Cal.4th 1037, 1054 ["photographs were not cumulative to the testimony of the police detectives and medical examiner; rather, they illustrated that testimony and made its import clearer to the jury"].) The principal effect of the photographs was to demonstrate the nature and extent of the injuries; not to inflame the jury or prejudice the jury against the defendant. The trial court did not err in admitting the photographs into evidence.

C. *CALCRIM No.362*

The court instructed the jury pursuant to CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a

12

statement cannot prove guilt by itself." Defendant argues the instruction contains an irrational permissible inference and results in a denial of due process. According to defendant, the irrational and impermissible inference is that the jury could infer defendant knew he stabbed Gonzales and Martin based on his false statements to police.

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' [Citation.]" (*Francis v. Franklin* (1985) 471 U.S. 307, 313.) An impermissible inference violates due process "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Ibid*.) The California Supreme Court has repeatedly rejected the argument that consciousness of guilt instructions "invite the jury to draw irrational and impermissible inferences." (*People v. Howard* (2008) 42 Cal.4th 1000, 1021; *People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1223.) The instruction was proper here because the jury could find the defendant made false statements at the side of the freeway—i.e., that there was blood on his hands because they had been involved in a traffic accident—to deflect suspicion away from him for the stabbing of two individuals who had been seated behind him in the SUV. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1057.) Accordingly, we conclude the trial court did not err in instructing the jury pursuant to CALCRIM No. 362.

D. *The Jury's Question*

The jury was properly instructed initially. It was informed that to convict defendant of attempted murder or attempted voluntary manslaughter, the jury must find defendant intended to kill the individual. Shortly after the jury recessed to deliberate defendant's guilt or innocence, it sent a note to the court, asking, "Is there a definition or explanation of 'intent to kill' or a legal definition of intent." The court conferred with counsel. Defendant did not suggest in his briefs what curative instruction should have

13

been given. The court looked at CALCRIM's use notes and bench notes for the attempted murder instructions and found no additional instructions on a definition of intent to kill. The court concluded it would instruct the jury as follows: "There is no further explanation of . . . 'intent to kill'. . . . [¶] 'Please refer to CALCRIM [No.] 200, the paragraph that says words and phrases not specifically defined in these instructions are to be applied using their ordinary everyday meanings.'" Both counsel agreed to the procedure and response.

Section 1138 sets forth the procedure for the trial court to follow when a jury asks a question of the court. "[T]he information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.) The court followed that procedure. Defendant argues the court erred in that it "had a duty to clarify the everyday meaning of the phrase 'intent to kill' in language that the jury could understand." As the Attorney General points out, section 1138 "does not mean the court must always elaborate on the standard instructions." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

There are a number of flaws in defendant's argument. First, counsel not only did not object to the court's proposed response to the jury, but also expressly agreed with the response, the issue has not been preserved for appeal. (§ 1259.) Although there are occasions when a failure to object to an instruction will not preclude consideration of the issue on appeal (see *People v. Charles* (2015) 61 Cal.4th 308, 329; § 1259 [appellate court may review instruction, "though no objection was made" below, if defendant's substantial rights were implicated]) that rule does not apply here. The failure to redefine "intent to kill," other than to say the phrase carries its everyday meaning does not involve the defendant's substantial rights.

Second, the instruction given in response to the jury's question informed the jury that "intent to kill," carried its everyday definition. Intent to kill is not a term of art with a different definition than one would give it in its everyday meaning. Because

14

the jury was fully and completely instructed prior to the matter being submitted to it, and it was instructed the phrase does not have a meaning other than its everyday meaning, there was no need to further define it for the jury.

There is no reason for us to assume the jury used a definition of "intent to kill" other than its everyday usage. Consequently, we reject defendant's contention.


E. *Defendant's Motion for a New Trial*

After the verdict, defendant brought a motion for a new trial on count one, wherein defendant was found guilty of attempted voluntary manslaughter as a lesser and included offense of attempted murder. The motion argued defendant was entitled to a new trial because the evidence did not support his conviction for attempted voluntary manslaughter. (§ 1181, subd. 6.) Defendant concedes there was sufficient evidence to support the convictions on appeal, but argues the court erred in denying his motion by using the wrong standard of review.

In reviewing a defendant's motion for a new trial based on a conviction purportedly not supported by the evidence, the trial court sits as a 13th juror and not only weighs the evidence, but also determines whether the evidence was believable. (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6.) Defendant claims the court erred in ruling on the new trial motion because the court "seemed to believe that the question it was asked to address was whether there was sufficient evidence to uphold the verdict on appeal." In other words, he claims the court used the substantial evidence standard of an appellate court, and did not conduct the independent review called for when considering a new trial motion.

We do not agree. While we presume the court used the proper standard of review (*People v. Sangani* (1994) 22 Cal.App.4th 1120, 1139) absent evidence to the contrary, it is also evident from the court's statements that it conducted an independent review of the evidence. "[I]n terms of asking this court to grant a new trial based on the

15

insufficiency of the evidence the court is going to deny that motion. *I think the jury got it right with their verdicts.* I don't see anything *when I do an independent weighing of the evidence*, that any of this evidence was not credible or unreliable that the jury used in coming to their verdicts." (Italics added.) The trial judge specifically stated he conducted an independent review of the evidence and having done so, reached the same conclusion as the jury. Thus, the court applied the appropriate standard in deciding defendant's new trial motion.

We review a trial court's denial of a defendant's new trial motion for an abuse of discretion, and will not reverse "'"'absent a manifest and unmistakable abuse of that discretion.'"'" [Citation.]" (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.) We find no such abuse here; the court independently evaluated the evidence and reached the same conclusion as the jury. Accordingly, the court did not err in denying defendant's motion for a new trial.

F. *The Restitution Fine*

The minimum restitution fine required by section 1202.4 has been modified a number of times in recent years. At the time of the offenses in 2011, the minimum restitution fine was $200. (Former § 1202.4, subd. (b)(1), as amended by Stats. 2007, ch. 302, § 14.) On January 1, 2012, the statutory minimum restitution fine was increased to $240, and on January 1, 2013, the minimum restitution fine was increased to $280 (§ 1202.4, subd. (b)(1)).

In this instance, the court imposed a $240 restitution fine at the time of defendant's sentencing. It appears the court intended to impose the minimum possible fine. "In addition you are to pay an appropriate restitution fine of $240 based on the date of the crime on September 3rd. [¶] Correct Ms. Reed?" The prosecutor then responded, "2011, yes. I believe so." Defendant claims imposition of a $240 restitution fine, when the court intended to impose the minimum possible restitution fine violates the ex post

16

facto clauses of our constitutions. The Attorney General agrees.

On September 3, 2011, when defendant committed the charged offenses, former section 1202.4 provided a minimum restitution fine of $200. (Former § 1202.4, subd. (b)(1).) In 2012, the minimum restitution fine was $240. At the time the court sentenced defendant on June 27, 2014, the minimum restitution fine was $300. (§ 1202.4, subd. (b)(1).) A restitution fine constitutes punishment for purposes of the ex post facto clause. (*People v. Souza* (2012) 54 Cal.4th 90, 143.) An increase in the minimum restitution fine makes the authorized punishment more burdensome. (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30-31.)

Therefore, the court could not apply an increased *minimum* restitution fine retroactively to defendant, whose crime occurred prior to the increase in the minimum restitution fine. Of course, the court was authorized to impose a $240 restitution fine, given the fact the statute in existence at the time of defendant's offenses authorized a restitution fine of not less than $200 and not more than $10,000 (former § 1202.4, subd. (b)(1), as amended by Stats. 2009, ch. 454, § 1), but if the court intended to impose the minimum possible fine—and the parties agree that is what the court intended here—the minimum restitution fine amount was $200. Accordingly, we direct the clerk of the court to amend the abstract of judgment to reflect a restitution fine of $200.

### III

### DISPOSITION

The clerk of the superior court is directed to amend the abstract of judgment to reflect the imposition of a $200 restitution fine instead of a $240 restitution fine, and to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is affirmed as modified.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.


18